THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v FRANCISCO MENDEZ, Appellant.

First Department, July 3, 1980

## APPEARANCES OF COUNSEL

*John D. B. Lewis* of counsel *(William E. Hellerstein,* attorney), for appellant.

*Charles L. Bach, Jr.,* of counsel *(Steven R. Kartagener* with him on the brief; *Mario Merola, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

Ross, J.

This appeal presents for our review the facts and circumstances surrounding "what has been described as the largest mass murder * * * in the history of New York State" as far as defendant's motive is concerned. These deaths resulted from an arson for profit.

In the early morning hours of October 24, 1976, the callous acts of defendant and others resulted in the fiery death of 25 patrons of a Bronx social club and the maiming and injury of scores more. Defendant challenges, *inter alia,* the concurrent indeterminate sentences imposed of 25 years to life on each murder count; the 8⅓ to 25 years on the arson count and the 5 to 15 years on the assault convictions.

The primary issue can thus be stated: when the courts of the State of New York impose a sentence equivalent to one year of incarceration for the felonious taking of an innocent life, can that be deemed an abuse of discretion. A majority of this court can find no such abuse. The dissent concludes otherwise.

On Saturday night, October 23, 1976, defendant and two acquaintances, Julio Hernandez and Hector Lopez, stole an automobile and drove through the streets of The Bronx until the car was no longer operable. This trio then stole a second automobile and continued their escapades. As they emerged from a neighborhood candy store around midnight, they were met by Antonio Cordero. Cordero called defendant over and

told defendant that he was having a "problem" with his lady friend, who was attending a dance at a nearby social club. Cordero explained that if defendant would help him obtain revenge by burning down the club, Cordero would give defendant a car and a free trip to Puerto Rico. Defendant accepted and then enlisted the aid of his two cohorts.

The four entered Cordero's car and proceeded to the vicinity of the club. Once there, they heard music and laughter coming from the second floor gathering. Thereafter, the group drove to the apartment of Cordero's sister where they found an empty, gallon milk container. Cordero informed his sister that they were going to burn the social club.

Returning to the car, the four drove to an open gas station and filled the gallon container with gasoline. They then proceeded to the target, where defendant and Lopez exited the car. These two proceeded to the only entrance where Lopez splashed the volatile liquid over the stairs and walls. Lopez then handed the container to defendant who poured the remaining gas out. Defendant turned the gallon container upside down to get every drop out and then left. Lopez ignited the pyre as the four sped away.

The fire immediately consumed the entire club, and killed nearly one half of those attending the dance. The fire was started at approximately 2:30 A.M. and within six minutes most of the fire had been extinguished. The fire department declared this holocaust under control in 28 minutes, but only after 10 men and 15 women lost their lives and numerous others were injured.

The calculated wrath of these four men did not cease with this single incident. They next drove through The Bronx, setting fire to the automobiles of two of Cordero's "enemies". Prior to parting company, Cordero cautioned all not to say anything about the night's feats or he would kill them. Apparently this admonition did not impress this defendant. Within two days of the fire, Mendez was bragging to several acquaintances about his "accomplishment".

Detective Luis Hernandez was given the assignment of investigating the arson-murders. Fire marshals, who were also assigned to this case, quickly determined that a flammable liquid was spread over the staircase. However, it was not until early December, 1976, when the first break in the case occurred. At that time Detective Hernandez received a call advising him that Julio Hernandez participated in the setting of the

fire. This initial contact led to Lopez and Cordero. All three then implicated defendant, who had fled New York and was staying with relatives in Puerto Rico.

On January 6, 1977, Detective Hernandez, accompanied by Fire Marshals Regan and Flanagan, flew to Puerto Rico to locate defendant. Four days later, while searching the Town of Arecibo for defendant, Hernandez received a call from a Bronx fellow detective advising Hernandez that defendant was willing to surrender. Arrangements were made among defendant, his mother and defendant's relatives in Puerto Rico for the voluntary surrender of defendant that evening.

At approximately 9:30 P.M., Detective Hernandez, the two fire marshals and a detective from the local police force, drove to the house of defendant's relatives. There Hernandez walked to the house and advised defendant and his assembled relatives, in Spanish, that Hernandez was arresting defendant and taking him back to New York for the social club fire. Defendant was then placed in the middle front seat for the 60-mile drive to police headquarters in Santurce.

This trip took approximately three and one-half hours because of stops for dinner and related exigencies. Detective Hernandez and Fire Marshal Regan testified that during this trip defendant was not handcuffed, nor was defendant questioned concerning his involvement in the fire. Hernandez stated that he did not advise defendant of his *Miranda* rights while in the car because he was following his customary practice of waiting until he was in a precinct before discussing a case with an accused.

This group arrived at the Santurce headquarters at approximately 12:30 the following morning. Detective Hernandez immediately advised defendant in Spanish of his constitutional rights. Defendant voluntarily waived these rights and provided the authorities with a complete statement of the crime and his participation therein.

This questioning was concluded approximately two and one-half hours later when Detective Hernandez and the fire marshals left defendant in the custody of the Puerto Rican police. Later that morning, the New York authorities picked defendant up and drove to the airport. There they caught the first available flight and arrived in New York at approximately 6:00 P.M. on January 11, 1977.

Some hours after the defendant's return to New York, and prior to the filing of an accusatory instrument, Mendez was

interviewed by an Assistant District Attorney. A second inculpatory statement was elicited from defendant. In this statement, however, defendant for the first time alleged that Cordero threatened to kill him and members of his family if he did not participate in the setting of the social club fire.

At a pretrial hearing, the court granted defendant's motion to suppress the latter inculpatory statement which he gave to the authorities upon his return to New York. The hearing court concluded that the delay in arraigning defendant required such suppression. As to the statements given to Detective Hernandez in Puerto Rico, the court discredited defendant's argument that he was psychologically coerced into rendering this account. The court noted that defendant's testimony in this regard was the product of an afterthought and defendant had not been "overreached". Moreover, the court found that although defendant was nearing his 17th birthdate, he was no stranger to the criminal justice system and that he had surrendered and talked in the hopes that some consideration would be given because he co-operated. Additionally, the hearing court determined that defendant was not physically coerced into giving this utterance and denied the motion to suppress as to this statement.

In this court defendant asserts that the statement given in Puerto Rico should have been suppressed because the totality of the circumstances suggest that it was not voluntary beyond a reasonable doubt. Specifically, defendant argues that his youth, inexperience and tired and confused state, enabled Detective Hernandez to trick him into waiving his rights by leading him to believe he was returning to New York solely to be a witness against Cordero and by befriending defendant on the trip to police headquarters in Puerto Rico prior to the questioning. We are all in agreement that this claim is without merit. Clearly, the hearing court was faced with an issue of credibility—weighing the testimony of Detective Hernandez and Fire Marshal Regan against that of defendant. Under these circumstances credibility is an issue to be determined by the trier of facts who is in a superior position to view the various witnesses and weigh their respective testimony (People v Wright, 71 AD2d 585). Where these factual determinations are supported by the weight of the evidence presented, as they are in the instant appeal, we will not set aside such findings.

Thus, the only issue which divides this court is the

sentence imposed. Defendant, for his participation, was sentenced, after trial by jury, to an indeterminate term of from 25 years to life. Lopez pled guilty to murder in the second degree and was sentenced to a term of from 15 years to life. Cordero also pled guilty to murder in the second degree and was sentenced to a term of from 20 years to life. The sentencing court when confronted with this disparity succinctly noted:

"[I]ndeed * * * when plea bargains were struck in another part of this courthouse this was at least a matter of thought and discussion by most of the court personnel and * * * whatever plea bargain was struck was a bargain. A bargain that this Court had no part in.

"And I am faced with the not easy task of reconciling the sentence that I must now pass upon you, Mr. Mendez, with that plea bargain."

It is evident that defendant's accomplices did receive a favorable plea. However, a sentencing court is not prohibited from varying the terms of imprisonment for a codefendant where warranted by appropriate circumstances. Here such circumstances exist.

The customary refrain that sentencing is a matter of discretion and will not be disturbed on appeal unless there is a clear abuse of discretion (*People v Junco*, 43 AD2d 266, affd 35 NY2d 419, cert den 421 US 951) is compellingly thrust into sharp focus by the circumstances of this appeal. A majority of this court can find no abuse of discretion and would affirm the sentence as imposed.

The dissent finds unacceptable the fact that Cordero and Lopez, who entered pleas of guilty, were sentenced to a lesser term than this defendant, who was convicted after trial by jury. The dissent's analysis that these unequal sentences lead to the conclusion that "Mendez was in fact punished by going to trial", is not borne out by any facts in the record before this court. Although defendant was slightly over 16 years of age when this incident occurred, the dissent completely ignores the fact that in 1973, when defendant was about 12 years old, he was involved in an armed robbery; in 1974 he was in Family Court under a petition for a person in need of supervision; in 1975, with three others over the age of 16, he was involved in the sexual molestation of a 12-year-old and a 14-year-old, wherein the 14-year-old was the victim of a multiple rape; and this defendant was involved in a burglary and

when interviewed he admitted numerous other offenses, including robberies and burglaries of which the authorities were not aware. He is known to the authorities for 13 delinquent acts prior to the indictment herein. The dissent would further overlook Mendez' deliberate act of placing a partially empty plastic container holding gasoline on a lower step so that the entire contents would drain thereon. Although Cordero solicited Mendez to commit these crimes, and inexcusable as Cordero's conduct was, it was based upon a misguided emotional desire to get revenge. This defendant's willingness to participate was based on the most unacceptable reason of all: a desire for personal profit.

Most importantly, the dissent utterly disregards the fact that this defendant, until this very date, does not have any feelings of guilt as he "didn't do anything". His complete lack of any sense of remorse or guilt clearly indicates that the sentence imposed was not only appropriate, but in no manner could it be considered an abuse of discretion. The Trial Justice at sentencing noted that "I am not here to pass judgment on a plea bargain. I'm here to pass judgment on you, and what you did on October 24, 1976". The court with the above facts before it varied the sentence of this defendant, and rightly so, from that of his accomplices. Any lesser sentence imposed herein would be a corruption of justice.

Accordingly, the judgment, Supreme Court, Bronx County (DROHAN, J.), rendered on March 7, 1978, convicting defendant after trial by jury of the crimes of murder in the second degree, arson in the second degree and assault in the first degree, should be affirmed.

CARRO, J. (dissenting in part). The defendant participated with three others in the commission of a truly horrible crime: the burning down of a social club resulting in the death of 25 people.

The dominant force in this crime, and by far the most culpable of those involved, was a man named Cordero, 40 years of age at the time, reportedly a local "hustler" and "strong-arm man," a man with substantial criminal background. Cordero was seeking revenge on a young girlfriend attending a dance at the social club. He recruited in this effort Mendez, then not yet 17 years of age, another youth, Lopez, 17 years old, and a juvenile. The testimony indicates that Cordero promised Mendez a car and a free trip to Puerto Rico if Mendez assisted him. Both Mendez and Lopez have claimed

that they were influenced at least in part by fear that Cordero would in some way injure them and their families if they did not assist him. It is impossible to determine from the record the accuracy of these claims.

The most troublesome issue is presented by the significant disparities among the sentences meted out to the participants. We do not think these are satisfactorily explained by the familiar proposition that it is appropriate to extend some consideration to those who plead guilty.

The defendant was convicted after a jury trial and sentenced to 25 years to life. Lopez pled guilty and was sentenced to a term of 15 years to life. We are not convinced that the 10-year difference in the minimum sentence imposed on two youthful perpetrators in a crime involving the death of 25 people is persuasively justified as an appropriate incident to a plea bargain. Lopez was no less culpable than Mendez and indeed the record indicates that his participation in the crime was more substantial.

Even more disturbing is the fact that Cordero was permitted to plead guilty and receive a sentence of 20 years to life. Considering that he was an adult, occupying a position of influence over the younger people whom he recruited, and by any standard incomparably the most culpable of the perpetrators, we find it shocking that he should have received a lesser sentence than Mendez. Under the circumstances clearly disclosed, this difference simply cannot be excused as the result of a plea bargain in which consideration was extended to Cordero for a plea. The palpable unfairness of these unequal sentences, leading to the conclusion that Mendez was in fact punished for going to trial, however that reality is sought to be disguised, requires in our view that his sentence be reduced to no more than that imposed on Cordero.

Accordingly, we would modify the judgment to the extent of reducing the sentence imposed upon this defendant to 20 years to life.

SULLIVAN and MARKEWICH, JJ., concur with ROSS, J.; SANDLER, J. P., and CARRO, J., dissent in part in an opinion by CARRO, J.

Judgment, Supreme Court, Bronx County, rendered on March 7, 1978, affirmed.