■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v STEVEN ERIC YOCUS, Appellant. — Appeal by defendant, as limited by his motion, from a

sentence of the Supreme Court, Kings County, imposed November 3, 1977. Sentence affirmed. No opinion. Gulotta, J. P., Cohalan and Weinstein, JJ., concur.

O'Connor, J., dissents and votes to modify the sentence, with the following memorandum: Convicted upon his plea of guilty to manslaughter in the first degree, defendant appeals, as excessive, from a 5- to 15-year sentence which he is presently serving, imposed upon that judgment of conviction. My confreres of the majority sustain the propriety of that sentence, but moved by the truly appalling and abhorrent circumstances here involved I am impelled to respectfully dissent. I would grant youthful offender status to the defendant and reduce his sentence to probation for five years (he has been incarcerated since 1977). Entirely mindful of the unspeakably repugnant nature of the crime — the murder of a grocery store proprietor during the course of an armed robbery — and deeply conscious of the intense public resentment against the extension of *any* indulgence to perpetrators of such monstrous crimes, I hasten to set forth, as simply as I can, my reasons for this dissent. Addressing first, in capsule form, the broad posture of crime and punishment in today's marketplace, it is beyond cavil that violent crime is ever on the increase and that it is, in all its terrifying aspects, continuously creating conditions of unspeakable horror on the streets of our cities. Recent surveys make crystal clear that Americans, in ever-increasing numbers, live in constant fear and trepidation. Who holds the blame? Who is the scapegoat? What is the solution? For almost a decade now, public opinion polls have consistently indicated that many citizens are firmly of the opinion that the courts are not severe enough in dealing with criminals, and many believe that the problem can only be resolved by the imposition of tougher and harsher punishment upon all found guilty of transgressing the law. Yet a calm objective evaluation of the facts indicates, contrary to these widely held views, that our courts are *not* soft on crime: nor is it true that either the rate or the severity of incarceration in any manner affects the crime statistics. As a matter of fact, the United States has a current imprisonment rate of 250 per 100,000 population — twice as high as Canada, three times as high as Great Britain, and four times as high as West Germany. Available statistics indicate that only the USSR, with a rate of 391, and South Africa, with 400, have higher incarceration rates than ours. It is not valid, however, to conclude from these figures, that our high incarceration rate is due to our high crime rate. Such a theory just doesn't hold water. A 1976 study by the American Foundation's Institute of Corrections finds *no* link between a State's crime rate and its incarceration rate. The study shows clearly that some States with high crime rates have both low incarceration rates, as in Hawaii, and high incarceration rates, as in Nevada, and further, that States with low crime rates vary greatly in their use of incarceration. Minnesota, for example, has a very low incarceration rate while Oregon has a high one. It is clear that increased or extended incarceration not only is enormously expensive but is equally ineffective as far as reducing the crime rate is concerned. To digress for the moment, I would here note my deep concern over the many mandatory sentence laws currently proposed in or passed by the Legislature. History tells us, if only we would listen, that such laws do not deter the criminal but greatly disturb the proper functioning of the entire criminal law system. Some seven years ago, in his commendable but completely futile efforts to contain and control drug abuse in New York State, Governor Nelson A. Rockefeller established mandatory sentences for violation of the drug laws. Our experience with them ever since has been dismal indeed. A study carried out by a team of researchers at the School of Criminal Justice of the State University of New York has found that mandatory prison sentenc-

ing "does not offer the protection it was intended to provide — fails to deter — is a source of radical dysfunction in the administration of justice." In an article published in the American Bar Association Journal some few years ago, Judge Caroline K. Simon summed it up in these words: "The mandatory sentence is perhaps most deleterious because it gives an illusion of protection. It incapacitates a major sector of the system of criminal justice by denying discretion to the courts. The system cannot be improved by denying discretion when the quality of personnel or practice is deficient. Before it can be carried out — with whatever benefits are claimed for it — a criminal must be arrested, charged, and convicted. Any streetwise crook knows that the odds are with him and that his chances of getting to the point of a mandatory sentence are slim indeed. The havoc that mandatory sentences would wreak on the system is considerable. No judicial plea bargaining could be hoped for since an admission of guilt would gain no advantage. Every suspect would fight to the last ditch to proclaim innocence. There would be more trials, more delays, much more work for prosecutors and judges, more imprisonment and detention, and possibly more acquittals. There is very little deterrence here." There is small comfort then in mandatory sentences! To the most casual observer it must be immediately apparent that the problem is much more complex than to lend itself to such simplistic solutions. It is elementary that we must redouble our efforts to seek out and remove the causes of crime and we must rethink our priorities and re-examine our theories. Perhaps it is time for us to look for alternatives to incarceration for nondangerous and rehabilitative offenders, for so-called white collar criminals and for many other nonviolent breakers of the law. The possibilities for significant progress in this area are limitless and the validity of such reforms has been clearly established by the truly significant results attained in countries like Sweden, Denmark and the Netherlands where the rate of incarceration is exceptionally low without any corresponding increase in the rate of crime. Moving now to the specifics of the issues before us, less than one month past his sixteenth birthday at the time the crime was committed, the defendant was then characterized by the Probation Department as "the product of a pathetically inadequate and disturbed family environment in which criminal behavior, mental illness, physical abuse and deprivation were a common occurrence." Abandoned by his true father, raised by a stepfather with a criminal record of 24 adult arrests and 17 convictions, dependent for inspiration upon a schizophrenic mother hopelessly addicted to alcohol and pills, it is less than surprising that defendant learned early and well the foul and evil ways of the street and but little of the true meaning of life. To this tragic and desolate scenario was now added the arch villain, a 50-year-old latter day "Fagin", one Salvatore Russato who, from their first meeting, exercised an unholy and unhealthy influence upon the then 15-year-old malleable youth, plying him with drugs and drink and by default assuming the mantle of substitute parent. On May 20, 1976 Russato drove the defendant, "stoned" on liquor, pills and marihuana, to the grocery store operated by Robert Pobega, telling defendant that he and Pobega had been in the business together until Pobega forced Russato out without any financial reimbursement. Sitting in the car outside the grocery, Russato loaded a .25 caliber automatic, explained its operation, showed him how to work its safety catch, handed the loaded gun to defendant and ordered him to "go in and get the money" remarking that Pobega "scares easily". It was under these most tragic circumstances that defendant blindly obeyed his mentor and during the course of the robbery Pobega was killed. Defendant returned the gun and the proceeds of the crime to Russato who drove him from the scene. Both were apprehended the next day at Russato's rooming house and thereafter, based partly on the

testimony of defendant, Russato was convicted of murder in the second degree and is presently serving a sentence of 25 years to life. The Probation Department characterized the role of the defendant in the commission of the crime, as "an atypical act committed by a physically and emotionally deprived youth who was used by a much older man who first plied him with alcohol and pills and then gave him the loaded gun." Defendant pleaded guilty to manslaughter in the first degree and was sentenced to a prison term of 5 to 15 years. While in prison he completed his high school education and received an equivalency diploma. Although still incarcerated he is presently enrolled as a successful student at a community college. He is now pleading for a chance to become a useful and productive member of society. It is not, for a moment, suggested that society can or should grant absolution to a miscreant found guilty of a crime, merely because, to again quote from defendant's probation report, he "is the product of a pathologically inadequate and disturbed family environment". Our entire Judeo-Christian concept of civilization is founded on the basic tenet that we are all possessed of a free will and that we can, within limits, pick and choose our goals and our way of life. Society must, at all costs, be protected and preserved and its predators and transgressors must be swiftly made to realize the error and the evil of their ways. But the penalty imposed should never be so devastating as to stifle repentence or destroy all hope of redemption. It is to that end that the youthful offender law was first enacted — to lend a helping hand, when the attendant facts and circumstances warrant, to the transgressor now on the long hard road back. With commendable candor and considerable courage, the Sentencing Judge here concluded that there was merit to defendant's applications and he strongly urged the Executive Clemency Bureau to commute the sentence he had imposed a short time before. This young man, finally emerging from the long dark night, has demonstrated, despite a cruel and crushing childhood, that he is a human being possibly worth saving. If we are ever to abandon the barren and sterile doctrine of revenge which, after all is said and done, is the bottom line to the current hue and cry for ever more severe sentences, and if we are ever to give more than lip service to the theory of rehabilitation, we must somehow find the courage to give this defendant a chance to live a meaningful life. This we must do before continued exposure to the horrors of prison life adds further and irreparable disenchantment to a life that has already known, all too soon, all too much of such things. The possible redemption of a human being hangs in the balance. I respectfully dissent.

Margett, J., dissents and votes to grant youthful offender status and reduce the sentence to probation for five years on the ground that the sentence was excessive.