THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JAMES SUITTE, Appellant.

Second Department, November 22, 1982

APPEARANCES OF COUNSEL

*Robert W. Farrell* (*Barry C. Weiss* of counsel), for appellant.

*Denis Dillon, District Attorney* (*Judith R. Sternberg* of counsel; *Susan J. Manne* on the brief), for respondent.

**OPINION OF THE COURT**

LAZER, J. P.

The defendant has pleaded guilty to criminal possession of a weapon in the fourth degree, a class A misdemeanor. The sentence we review consists of 30 days of imprisonment and three years of probation, the jail time to be a condition of and to run concurrently with the period of probation. Execution of the sentence has been stayed pending this appeal. In the course of a typically eloquent opinion dissenting from our vote to affirm, Justice O'CONNOR concludes that the custodial portion of the sentence is an abuse of discretion, castigates as futile the vast national emphasis upon incarceration as a means of punishment,

attacks the resultant pressures that a vengeance-ridden society imposes on the judicial system and condemns the crushing effects of those pressures upon those unduly punished as a consequence. In our colleague's view, the sentence "borders on the obscene". Although we share Justice O'CONNOR's concern over the state of the Nation's correctional processes, we still cannot agree that the sentence imposed represents excessive punishment or abuse of sentencing discretion.

When arrested in January, 1981, for unauthorized use of a motor vehicle, based on what seems to have been a misunderstanding, James Suitte was found to possess a loaded Sterling .25 calibre automatic pistol. Although Mr. Suitte had registered the gun in North Carolina when he acquired it there in 1973, he carried it unlicensed in this State for the seven and one-half year period preceding his arrest. College educated for three years, Mr. Suitte is 46 years old, has been married for 25 years, and has two children, aged 14 and 21 years. He has never before been convicted of a crime. Although he admits he was aware of New York's gun licensing requirement, he claims that the gun was necessary for protection because the tailor shop he operates is located in a high crime area of The Bronx.

The plea of guilty was a bargained one. Originally charged with the class D felony of criminal possession of a weapon in the third degree, Mr. Suitte was permitted to plead to the misdemeanor of possession in the fourth degree. In imposing sentence under the new gun statute and its mandatory one-year imprisonment provision (Penal Law, §§ 70.02, 70.15) — publicized in the State as the "toughest gun law in the country" (L 1980, ch 233, eff Aug. 12, 1980; Governor's Memorandum, NY Legis Ann, 1980, p 107) — the sentencing Judge found the mandatory one-year jail provision too severe. He noted, however, "the Legislature, the community and indeed this Court [are] concerned with the proliferation of guns and the possession of guns by individuals in the community, regardless of the reasons, and we have such a possession in this case." He then exercised his discretion under the statute and imposed a jail sentence of 30 days plus three years' probation. The jail portion of the sentence is the focus of the appeal.

The new gun statute has substantially increased the penal sanctions for possession and sale of illegal weapons. The major change from previous law is the mandatory imposition of a prison sentence of at least one year upon conviction of possession of a loaded weapon outside the home or place of business. The legislation contains additional procedures, however, which, *inter alia,* permit imposition of a lesser sentence upon conviction of possession in the fourth degree if "the court having regard to the nature and circumstances of the crime and to the history and character of the defendant, is of the opinion that such sentence would be unduly harsh" (Penal Law, § 70.15, subd 1). This mitigation inquiry relative to possession in the fourth degree is limited to individuals who have not been convicted of either a felony or a class A misdemeanor within the preceding five years (Penal Law, § 70.15, subd 1). Other provisions of the new law prohibit preindictment plea bargaining, restrict postindictment plea bargaining (CPL 220.10, subd 5, par [d], cl [iii]), and expedite the processing of licensing requests (Penal Law, § 400.00, subd 4-a).

The statute is an obvious expression of the State's reaction to the current avalanche of gun-related crimes. In approving the law, Governor Carey proclaimed: "We must bring an end to the proliferation of illegal handguns in New York and the intolerable assaults on law enforcement officers and law-abiding citizens. We must let it be known that New York has the toughest gun law in the country and that it will be strictly enforced. We are determined to rid our streets of those who would do violence to its citizens" (Governor's Memorandum, NY Legis Ann, 1980, p 107). The Governor viewed the amended gun law as even more stringent than that of Massachusetts, which had been considered the strictest in the country (see "Carey Signs a Bill Controlling Guns; Calls it 'Toughest'", *New York Times,* June 14, 1980, I, p 1, col 6). Mayor Koch termed the legislation "a significant first step in the fight to remove illegal handguns from the streets of our city" (*id.,* p 27, col 4).

Early returns on the law — later ones are not available — indicate that applications for gun licenses have in-

creased (see "Record Number Ask Gun Permits in New York City", *New York Times,* March 16, 1981, I, p 1, col 5), fewer gun possession cases have been reduced to misdemeanors, and sentences of incarceration have been imposed in more instances than before the law (see Report of New York State Division of Criminal Justice Services, Feb., 1982, pp 122-123). Slightly more than half of the adults convicted of gun possession received at least the mandatory one-year minimum (*id.,* p 111).

Whatever its ultimate success in a Nation bedeviled by handguns, there can be no doubt that the State's 1980 legislation represents a vivid manifestation of public policy intended to make illegal possession of guns a serious criminal offense accompanied by the strong prospect of punishment by penal servitude. While we note our colleague's negative view of the wisdom of the statute, it is not for the court to pass on the wisdom of the Legislature, for that body "has latitude in determining which ills of society require criminal sanctions, and in imposing, as it reasonably views them, punishments, even mandatory ones, appropriate to each" (*People v Broadie,* 37 NY2d 100, 117, cert den 423 US 950). We turn, then, to the role of the judiciary in enforcing this public mandate that the crime of illegal possession of a gun be impressed upon all as a serious offense against society.

It is scarcely worth repetition to observe that a sentencing determination is a matter committed to the exercise of the sentencing court's discretion, for it is that court's primary responsibility (*People v Farrar,* 52 NY2d 302, 305; *People v Notey,* 72 AD2d 279, 282). Sentencing involves consideration of the crimes charged, the particular circumstances of the offender, and the purposes of a penal sanction (*People v Farrar, supra; People v McConnell,* 49 NY2d 340, 346). "It is the sensitive balancing of these * * * criteria in the individual case that makes the process of sentencing the most difficult and delicate decision that a Judge is called upon to perform" (*People v Notey, supra,* p 283).

As has been oft-stated, the four principal objectives of punishment are deterrence, rehabilitation, retribution and isolation (*People v Notey, supra,* p 282; Perlman & Steb-

bins, Implementing an Equitable Sentencing System: The Uniform Law Commissioners' Model Sentencing and Corrections Act, 65 Va L Rev 1175, 1176; Pugsley, Retributivism: A Just Basis for Criminal Sentences, 7 Hofstra L Rev 379, 381; Crump, Determinate Sentencing: The Promises and Perils of Sentence Guidelines, 68 Ky L J 1, 28). While deterrence includes individual deterrence directed at preventing the specific offender from repeating the same or other criminal acts, it also includes general deterrence which aims to discourage the general public from recourse to crime (Campbell, Law of Sentencing, § 5; Mueller, Sentencing, Process & Purposes, p 48; Carlson, The Dilemmas of Correction, p 29). Rehabilitation is directed, of course, at reform of the individual, while retribution includes "the reaffirmation of societal norms for the purpose of maintaining respect for the norms themselves", community condemnation, and the community's emotional desire to punish the offender (see Note, Appellate Review of Primary Sentencing Decisions: A Connecticut Case Study, 69 Yale LJ 1453, 1455). Isolation serves simply to segregate the offender from society so as to prevent criminal conduct during the period of incarceration (see Pugsley, Retributivism: A Just Basis for Criminal Sentences, 7 Hofstra L Rev 379, 387). It is clear that the principal aim of the 1980 gun legislation is general deterrence.

The most difficult problem confronting the sentencing Judge is determination of the priority and relationship between the objectives of punishment (see *People v Notey,* 72 AD2d 279, 283, *supra*), a matter of considerable and continuing debate (see, e.g., Crump, Determinate Sentencing: The Promises and Perils of Sentence Guidelines, 68 Ky LJ 1, 27). Inevitably, there are bound to be differences of opinion in the relative values assigned these factors in particular cases (Hopkins, Reviewing Sentencing Discretion: A Method of Swift Appellate Action, 23 UCLA L Rev 491). The theories frequently are in unavoidable and constant conflict (*ibid.;* Reduction of Criminal Sentences on Appeal, 37 Col L Rev 521) and those that prevail in the sentencer's mind obviously decide the degree of punishment. Much of the controversy and criticism swirling about the contemporary sentencing scene relates to inequitable

disparities between sentences for the same or similar crimes (Dawson, Sentencing, The Decision as to Type, Length, and Conditions of Sentence, pp 216-217; Rubin, Criminal Correction [2d ed], ch 4, § 6; Williams, Law of Sentencing and Corrections, p 27; Frankel, Criminal Sentences, p 5; Levin, Toward a More Enlightened Sentencing Procedure [Symposium: The Tasks of Penology], 1976, p 137). The disparities derive primarily from differing philosophies and attitudes of Judges and a lack of consensus concerning the goals of criminal justice (Dawson, *op. cit.;* Rubin, *op cit.;* Frankel, *op. cit.,* p 23; Levin, *op. cit.,* p 139).

Appellate review of sentences obviously is a useful means of diminishing sentencing disparity (Williams, *op. cit.;* ABA Standards Relating to Appellate Review of Sentences, Approved Draft [1968], § 1.2) and ensuring the imposition of fair sentences. Nevertheless, the limited nature of appellate review of sentences is a recognition that "the sentencing decision is a matter committed to the exercise of the [sentencing] *court's* discretion" (*People v Farrar,* 52 NY2d 302, 305, *supra*). A reviewing court lacks some of the first-hand knowledge of the case that the sentencing Judge is in a position to obtain, and therefore the sentencer's decision should be afforded high respect (*People v Notey,* 72 AD2d 279, 282, *supra;* Labbe, Appellate Review of Sentences: Penology on the Judicial Doorstep, 68 J Crim L & Criminology 122). As a consequence, abuse of discretion is the test most frequently cited as the one to be applied (see, e.g., *People v Frazier,* 86 AD2d 557; *People v Mendez,* 75 AD2d 400, 405; *People v Junco,* 43 AD2d 266, affd 35 NY2d 419, cert den 421 US 951). The abuse of discretion standard is especially befitted to an era in which most convictions derive from plea bargains where the bargaining leverages of the respective parties to the agreement are ofttimes more important in fixing the degree of the crime pleaded to and the other limits of the sentence to be imposed than matters of guilt, fault, character, mitigative circumstances or other factors which might seem more relevant. Nevertheless, since the Legislature has empowered us to modify sentences "as a matter of discretion in the interest of justice" (CPL 470.15, subd 3) and our general review powers include the right to do whatever the trial

court could have done (*Jacques v Sears, Roebuck & Co.,* 30 NY2d 466; *Phoenix Mut. Life Ins. Co. v Conway,* 11 NY2d 367; *O'Connor v Papertsian,* 309 NY 465) even in matters entrusted to the discretion of that court (see *Robinson v Interurban St. Ry. Co.,* 113 App Div 46; *Serwer v Serwer,* 71 App Div 415), we can substitute our own discretion for that of a trial court which has not abused its discretion in the imposition of a sentence. The power to substitute discretion helps us to meet recommended sentence review standards by making any disposition the sentencing court could have made, except an increased sentence (see ABA Standards Relating to Appellate Review of Sentences, Approved Draft [1968]). Without the substitution power, our ability to rectify sentencing disparities, reach extraordinary situations, and effectively set sentencing policy through the development of sentencing criteria, would be sorely handicapped (see Note, Appellate Review of Primary Sentencing Decisions: A Connecticut Case Study, 69 Yale LJ 1453, 1477; Labbe, Appellate Review of Sentences: Penology on the Judicial Doorstep, 68 J Crim L & Criminology 122, 128).

Appellate review determines whether the sentence is excessive to the extent that there was a failure to observe the principles of sentencing (ABA Standards Relating to Appellate Review of Sentences, Approved Draft [1968]; Mueller, Penology on Appeal: Appellate Review of Legal but Excessive Sentences, 15 Vand L Rev 671). In such review, the court takes a "second look" at the sentences in light of the societal aims which such sanctions should achieve (*People v Notey, supra,* p 284; Note, Appellate Review of Primary Sentencing Decisions: A Connecticut Case Study, 69 Yale LJ 1453). But in reducing any sentence, the appellate body must be sensitive to the fact that its actions become guidelines for the trial court to follow in the imposition of future sentences under circumstances similar to the case reviewed.

In the current case, there has been no abuse of discretion and we perceive neither a failure to observe sentencing principles nor a need to impose a different view of discretion than that of the sentencing Judge. True, the defendant does not appear to be a danger to society or in apparent

need of rehabilitation. It is plain, however, that the sentencing court viewed general deterrence as the overriding principle, and we cannot say that the emphasis was erroneous or that the interests of justice call for a reduction (see *People v Gittelson,* 25 AD2d 265, affd 18 NY2d 427). Deterrence is the primary and essential postulate of almost all criminal law systems (Zimring and Hawkins: Deterrence, The Legal Threat in Crime Control, p 1). In this era of conflict between the adherents of the rehabilitation model (Orland, Is Determinate Sentencing an Illusory Reform? 62 Judicature 381) and those who advocate determinative sentencing (Fogel, Justice, Not Therapy: A New Mission for Corrections, 62 Judicature 372; van den Haag, Punitive Sentences, 7 Hofstra L Rev 123), it is hardly debatable that prisons do deter even if the degree of deterrence and the types of persons deterred remain in dispute (Carlson, The Dilemmas of Corrections, p 28). Even when imposing an "individualized" sentence, the Judge may look beyond the offender to the presumed effect of the sentence on others (*United States v Foss,* 501 F2d 522, 528). Indeed, the primary purpose behind mandatory sentence laws is to impose swift and certain punishment on the offender (see Senna & Siegel, Introduction to Criminal Justice [2d ed], p 428). A short definite period of confinement under the circumstances has been seen as the most effective method of deterrence (see Newman, Introduction to Criminal Justice, p 245; Hoffman, Purposes and Philosophy of Sentencing, 75 FRD 287, 317; Tao, Crime, Punishment & Law Enforcement, 23 Wayne L Rev 1395). As Marvin Frankel has written, general deterrence may be satisfied through "relatively short but substantially inexorable sentences to prison" (Frankel, Criminal Sentences, p 110). Some commentators have concluded that lesser punishment for firearm crimes, e.g., fines, probation or suspended sentences, is not significant enough to have any real deterrent effect (see Beha, "And *Nobody* Can Get You Out," The Impact of a Mandatory Prison Sentence for the Illegal Carrying of a Firearm on the Use of Firearms and on the Administration of Criminal Justice in Boston, 57 Boston U L Rev 96, 322; Chambliss, The Deterrent Influence of Punishment, 12 Crime & Delinquency 70).

In emphasizing the mandatory minimum sentence and the purpose of deterrence, the new gun legislation intended to convey to the public a "get tough" message on crime (see Governor's Memorandum, NY Legis Ann, 1980, p 107; see also, 16 Crim L Bull 150, commenting on Massachusetts' mandatory minimum sentence gun law — Mass Gen Laws Ann, ch 269, § 10, subd [a]). In this regard, the advertisements heralding the new law are significant; thus: "If you get caught carrying an illegal handgun, you'll go to jail for one year. No plea bargaining. No judges feeling sorry for you. Just one year in jail" (see "State's Gun Law: Impact & Intent Uncertain", *New York Times,* April 11, 1982, I, p 1, col 2).

With such a background, we cannot view the new gun law as containing a blanket exception of first offenders from the scope of its penal provisions. The statute's provisions for mitigation are not *carte blanche* for the commission of one offense free of the threat of a sentence of custodial detention. The sense of the new law is to deter all unlicensed handgun possessions, whether the offense is the first or a repeat. The special mitigation inquiry is not intended to provide automatic probation for those without prior criminal records. The penalty to be imposed is a matter for the trial court's broad discretion within the limits imposed by the Legislature. In balancing the public and private interests represented in the criminal justice process (see *People v Farrar,* 52 NY2d 302, 306, *supra*), the sentencing court's decision in this case was neither inconsistent with sound sentencing principles (see Perlman & Stebbins, Implementing an Equitable Sentencing System: The Uniform Law Commissioners' Model Sentencing and Corrections Act, 65 Va L Rev 1175), nor inappropriate. We see nothing obscene about a 30-day jail sentence (which is subject to a 10-day reduction for good behavior) for possession of a gun, particularly when the defendant has a history of carrying the weapon for over seven years with knowledge of the law's requirements.

Reduction of the current sentence by this court would proclaim to those listening that the new gun law presents no threat of jail to first criminal offenders. Such a reduction would also declare to the trial Bench that a Judge who

imposes a 30-day jail sentence on such a first offender has either abused his discretion or that this court disagrees with the sentencer's evaluation of the relevant sentencing factors. Finally, reduction would be this court's expression that violation of the gun law is nothing serious.

Accordingly, the sentence is affirmed.

O'CONNOR, J. (dissenting). In his usual scholarly and impelling style, my esteemed confrere of the majority, Justice LAZER, reviews the principles and discusses the rationale attendant upon sentencing and its appellate review. And so we go pell mell on our merry, merry way! More crimes are committed, more police make more arrests, more District Attorneys process more cases, more Judges commit more people to jail, and here, the majority would affirm a jail sentence despite the presence of what, by any standard, was an abuse of sentencing discretion that warrants, nay demands, a reduction to probation. I cannot agree.

Recently released Justice Department figures for 1981 indicate that there were 369,000 adults in Federal and State prisons at the end of that year, plus nearly 157,000 in local jails.[1] The National Council on Crime and Delinquency reports that the United States trails only the Soviet Union and South Africa (what a combination!) in its per capita rate of incarceration and, contrary to popular belief, in the severity of the punishments it inflicts![2] And in spite of it all, the crime rate continues to soar.[3]

It must be further noted that recent responsible studies on national and State levels have long since sounded the tocsin. Our badly overcrowded prisons are but a smoldering time bomb awaiting the explosion!

It seems to me that it's about time we begin to find, in matters such as this where no violence or even threat of violence is present, alternatives to jail. I further believe that rather than joining those who bend before the incessant cry of a rightly outraged public for vengeance we, as

1. *New York Times,* Aug. 16, 1982, IV, p 11, col 4.

2. See *People v Yocus,* 79 AD2d 1037, 1038 (O'CONNOR, J., dissenting).

3. A clear indication of the utter futility of it all! Is it not by now abundantly clear that the answer to crime lies not in sterner and tougher sentences?

appellate Judges, should seek to put some sanity into the sentences we approve under these circumstances.

I agree with the principle, articulated in the majority opinion, that an appellate court ought not disturb a sentence in the absence of an abuse of discretion by the sentencing court or unless the interest of justice so requires. I further agree that a workable test for applying this principle is whether the alleged excessiveness of the challenged sentence in fact demonstrates a failure by the sentencing court to observe the purposes of sentencing: individual and general deterrence, rehabilitation, retribution and isolation. I can even agree to the soundness of visiting upon one individual a punishment greater than would have been his had the sentencing court not decided to make an example of him in order to curb sharply a sudden manifestation in the general public of pernicious conduct previously endemic to certain subclasses, e.g., drug abuse, or to overcome widespread public intransigence to legislated curbs on historically unregulated conduct such as gun possession. But I disagree with the majority's statement that the sentencing Judge, rather than this court, may on an *ad hoc* basis, subject only to personal predilections, establish the coefficients to the four variables of deterrence, rehabilitation, retribution and isolation in this sentencing formula. This court should not abdicate its responsibility for the assignment of appropriate, if somewhat inexact, weights to these factors in the discharge of its obligation to control sentencing discretion within the overarching limits fixed by the Penal Law.

Is it just or proper that we permit one sentencing Judge to count general deterrence as the overriding factor in this gun possession case under the new antigun law, with the implication that another sentencing Judge in a *factually* identical case may switch the emphasis in the formula to another factor, e.g., rehabilitation? Bear in mind that the difference resulting from our toleration of such *ad hoc* legislating by sentencing Judges is *incarceration,* and I most vehemently reject any argument that incarceration is but a gentle escalation of sanctions to the point at which a real deterrent effect can finally be ascertained operating on the populace. After all, 30 days in the county jail will

surely cripple the spirit of any otherwise law-abiding citizen who honestly believed that the cost of unlawfully possessing a gun (discounted tremendously by the infinitesimally small probability of being caught) outweighed the benefit of protecting his life while conducting his livelihood in an urban war zone. I submit that it is we, as the Appellate Division, that should assign the approximate values to the parameters of the sentencing formula (to the extent possible), and that we should restrict sentencing Judges to their proper role in applying this legal formula, as so weighted, to the facts as they find them in individual cases.

I pose the questions:

(1) Is it a proper exercise of discretion to sentence to jail a first offender who poses no serious threat to the community?

(2) Does the nature of the crime here committed make it a serious threat to the community?

With these thoughts in mind, let us look at the case at bar.

On the morning of January 20, 1981, while driving through Nassau County on his way to his place of business in New York City, the defendant was stopped and arrested on a bench warrant charging him with the unauthorized use of a motor vehicle.

The validity of that warrant, or the merits of the complaint upon which it was issued, are not before the court at this time, but it should be noted that it is defendant's contention that the charge is totally without substance, arising, he alleges, out of a misunderstanding involving the return by him of a rented automobile.

Be that as it may, upon his arrest he was found in possession of a loaded Sterling .25 calibre automatic pistol. He was promptly charged with the crime of criminal possession of a weapon in the third degree, a class D felony, was convicted on his plea of guilty to possession in the fourth degree, a class A misdemeanor, and was sentenced to three years' probation with the special condition that he serve a determinate sentence of 30 days in the Nassau

County Correctional Center. Execution of that sentence has been stayed pending appeal.

Upon appeal to this court as excessive, that sentence has been affirmed by my confreres of the majority. I respectfully disagree and strongly suggest that under the facts and circumstances here extant, it is totally inappropriate and completely counterproductive to impose a jail sentence for however short a period of time.

An objective review of the record establishes that this defendant, a successful businessman, with three years of college education, is married and the father of two children, a daughter, aged 21, and a son, 14 years of age.

Since 1973 the defendant has owned and operated a custom tailor shop which is located in a high crime area of The Bronx. A prior owner of the shop had been stabbed during one of several robberies that took place before defendant became the proprietor. The defendant lawfully purchased the gun in question in North Carolina and properly registered it in that State.

According to the arresting officers, the defendant was "very cooperative" when arrested, and readily admitted that he knew that it was illegal to carry an unregistered pistol in New York City and stated that although he had inquired about obtaining a gun permit, he had never completed the process. The defendant told the police that he thought he needed the gun for self-protection.

The probation report contains this significant appraisal: "The present offense is the defendant's only criminal conviction and his first criminal charge in 21 years. He appears to be a devoted father and husband, as well as a productive member of society. There is no evidence of criminal intent in his possession of this weapon and his desire for protection in his business neighborhood is justified."

No one can sustain this defendant, or any person, in the illegal possession of a loaded firearm. It is a clear violation of law and calls for an appropriate sanction and penalty. But under the clear and compelling circumstances here present, is it appropriate or fair or just to send this first offender off to jail for 30 days, 10 days or even one day? To

me, such a sentence based upon these facts is cruel and harsh and borders on the obscene.

It is beyond cavil that violent crime is ever on the increase and that it is, in all its terrifying aspects, continuously creating conditions of unspeakable horror on the streets of our cities. Out of these jungle conditions in crescendo fashion, the cry of an aroused and frightened public is heard demanding, with good reason, swift and effective measures to contain and to curtail the monstrous abominations which are daily visited upon them. The fire is fueled by those who should and do know better but who, seizing upon a popular theme, pick up the cry and, by some total distortion of reason, imply that the fault lies with the judiciary and suggest that tougher and longer prison sentences are the solution. The Legislature responds by passing more and more mandatory sentencing laws and the press and other news media not infrequently give at least tacit approval to such measures. And all the time, Judges sitting in the eye of the storm, know that the catastrophic rise in crime bespeaks a failure not alone of society, but of the family, the church, the schools, the home and of the economic and political structure of the State itself. We know, too, that there are as many reasons for crime as there are people who commit it and we have long since learned that there is no simple solution or ready answer to the problem. I have previously expressed my disapproval of mandatory sentences[4] because of a firmly held opinion that mandatory sentences give to a worried and frightened public the illusion of protection, that they do not deter the criminal and, worst of all, that they incapacitate a major section of the system of criminal justice in denying discretion to the courts. Are we really ready to give up on the theory that the punishment fit the crime?

To the issue before us — to tack on an additional jail sentence for the possession and/or use of the gun, loaded or unloaded, in or about the commission of a crime, makes much sense and may even be effective. However, to send an otherwise law-abiding citizen to jail on his first offense under the facts of this case makes no sense, accomplishes no good and creates nothing but untoward hardship and

---

4. *People v Yocus,* 79 AD2d 1037, 1038-1040.

bitterness. I respectfully dissent and would modify the sentence by striking the 30-day period of incarceration.

THOMPSON and NIEHOFF, JJ., concur with LAZER, J. P.; O'CONNOR, J., dissents and votes to modify the sentence by deleting the period of incarceration, with an opinion.

Appeal by defendant, as limited by his motion, from a sentence of the County Court, Nassau County, imposed June 16, 1981.

Sentence affirmed.

This case is remitted to the County Court, Nassau County, for further proceedings pursuant to CPL 460.50 (subd 5).