People v Richard (2018 NY Slip Op 08152)





People v Richard


2018 NY Slip Op 08152


Decided on November 28, 2018


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on November 28, 2018
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

LEONARD B. AUSTIN, J.P.
SHERI S. ROMAN
COLLEEN D. DUFFY
LINDA CHRISTOPHER, JJ.


2014-05069
 (Ind. No. 4348/12)

[*1]The People of the State of New York, respondent,
v
Alvin Richard, appellant.


Paul Skip Laisure, New York, NY (Alexis A. Ascher of counsel), for appellant.
Eric Gonzalez, District Attorney, Brooklyn, NY (Leonard Joblove and Thomas M. Ross of counsel), for respondent.



DECISION & ORDER
Appeal by the defendant from a judgment of the Supreme Court, Kings County (William M. Harrington, J.), rendered May 8, 2014, convicting him of manslaughter in the first degree, upon a jury verdict, and sentencing him to a determinate term of imprisonment of 15 years, to be followed by 5 years of postrelease supervision.
ORDERED that the judgment is modified, as a matter of discretion in the interest of justice, by reducing the sentence imposed from a determinate term of imprisonment of 15 years, to be followed by 5 years of postrelease supervision, to a determinate term of imprisonment of 10 years, to be followed by 5 years of postrelease supervision; as so modified, the judgment is affirmed.
To the extent that the defendant contends that the People did not present legally sufficient evidence that the victim's death was reasonably foreseeable, that argument is unpreserved for appellate review because the defendant failed to move for a trial order of dismissal on the basis of that specific claim (see People v Hawkins, 11 NY3d 484; People v Villanueva, 136 AD3d 1068). In any event, viewing the evidence in the light most favorable to the prosecution (see People v Contes, 60 NY2d 620), we find that it was legally sufficient to establish the defendant's guilt of manslaughter in the first degree beyond a reasonable doubt (see People v Gobardhan, 150 AD3d 882). Moreover, in fulfilling our responsibility to conduct an independent review of the weight of the evidence (see CPL 470.15[5]; People v Danielson, 9 NY3d 342), we nevertheless accord great deference to the jury's opportunity to view the witnesses, hear testimony, and observe demeanor (see People v Mateo, 2 NY3d 383, 410). Upon reviewing the record here, we are satisfied that the verdict of guilt was not against the weight of the evidence (see People v Romero, 7 NY3d 633).
Viewing the record in the light most favorable to the defendant, we agree with the Supreme Court that there was no reasonable view of the evidence by which the jury could have found that the defendant was justified in using deadly physical force because he reasonably believed that the victim was committing or attempting to commit a burglary (see Penal Law § 35.20[3]; People v Cox, 92 NY2d 1002; People v Sadler, 153 AD3d 1285, 1286; People v Beckford, 49 AD3d 547, 548). Accordingly, we agree with the court's denial of the defendant's request to instruct the jury on the defense of justification.
Moreover, the defendant was not deprived of the effective assistance of counsel based [*2]upon trial counsel's failure to request a justification charge pursuant to Penal Law § 35.30(4). Viewing the record in the light most favorable to the defendant, no reasonable view of the evidence would support a finding that the defendant used physical force to effect an arrest or to prevent an escape from custody (see Penal Law § 35.30[4]; People v Witherspoon, 147 AD3d 985; People v Albritton, 63 AD3d 749; People v Hayes, 51 AD3d 688; People v Davis, 293 AD2d 486).
The sentence imposed was excessive to the extent indicated herein.
AUSTIN, J.P., DUFFY and CHRISTOPHER, JJ., concur.
ROMAN, J., concurs in part and dissents in part, and votes to affirm the judgment, with the following memorandum:
I disagree with the majority's determination that the sentence of imprisonment of 15 years imposed upon the defendant's conviction of manslaughter in the first degree was excessive. The record reflects that the victim was the subject of a violent, unprovoked assault that ultimately resulted in his death. Therefore, I respectfully dissent from so much of the majority's determination as reduced the defendant's sentence, and vote to affirm the judgment of conviction.
The defendant, who was charged with murder in the second degree, was convicted of manslaughter in the first degree in connection with the death of Kevin Farmer. The evidence at trial established that on September 1, 2011, at approximately 3:00 a.m., Farmer mistakenly attempted to enter the defendant's apartment. Farmer's friend, Priscilla Hall, testified at trial that she had given Farmer the keys to her apartment in Brooklyn and asked him to go there to retrieve her purse while she stayed behind at her sister's house. Farmer had never been to Hall's apartment and mistakenly went to an apartment on the third floor, instead of Hall's apartment on the second floor, apartment 2E. Hall testified that Farmer called her and said that the key was not turning in the lock, and that he was on the third floor standing in front of apartment 3E. She ascertained that he was at the wrong apartment, and asked him to stay with her on the phone while he walked down the stairs to her apartment. Hall stated that Farmer entered her apartment while they were still on the phone together and retrieved her purse. After their phone conversation ended, Hall never spoke with Farmer again.
The defendant recounted in his videotaped statement to the police that, on the night in question, he had awoken to the sound of someone tampering with his door. He peered through the peephole and saw someone at his door. The defendant indicated that he put on his shorts so that he could confront the individual. However, by the time the defendant got back to his door, the individual was no longer there.
The defendant stated that he left his apartment to search for the individual. He took the elevator up to the sixth floor and walked down the stairs to the first floor. The defendant then walked through the lobby and vestibule, and out the front door to search the sidewalk and street for the individual, but the defendant did not see the individual. Surveillance video from cameras located inside the lobby and vestibule of the apartment building showed the defendant walking around, making his way to the front of the building, and calmly placing newspapers in the front door to prevent the door from locking him out. The defendant was depicted walking toward the street, down the sidewalk, and back to reenter the building.
The surveillance video also captured the moment when the defendant located Farmer in the lobby as Farmer was walking to exit the building. According to the defendant, Farmer said to the defendant, "my mistake." The defendant immediately approached Farmer and struck him, and Farmer ran in the opposite direction toward the back of the apartment building. The defendant pursued Farmer, and the two eventually ran out of the view of the camera.
The defendant claimed that as Farmer was running from him, Farmer tripped and fell on the stairs leading up to the second floor of the building. The defendant testified that when Farmer tried to get up, the defendant pushed Farmer back down and kicked him. The defendant admitted in his statement that while Farmer was on the ground, the defendant kicked him "repeatedly" in the ribs and head. The defendant only stopped kicking Farmer after the defendant's mother, who had [*3]been upstairs in the defendant's apartment, located him and told him to stop. The defendant left Farmer lying on the ground, bleeding, and did not call the police.
Shortly thereafter, the superintendent of the building, who was inside his apartment, heard "gargling" and "choking" sounds emanating from the lobby. He discovered Farmer lying on the stairs with blood coming from his head and mouth, and called the police. A responding police officer testified that he observed Farmer "bleeding profusely out of the head, foaming out of the mouth, [and] unconscious," and his eyes were "rolled back in his head." The police officer also observed the "outline of a footprint in blood on [Farmer's] shirt."
Farmer was transported to the emergency room and arrived in critical condition with significant head trauma. He also had rib fractures, a large laceration on his scalp, a small laceration above his left eye, and the area around both of his eyes was bruised. The medical testimony reflected that Farmer was unable to make any sounds, did not respond to any kind of stimuli, and occasionally made involuntary motions that were consistent with a high level of brain dysfunction.
A CT scan revealed contusions and multiple areas of bleeding in Farmer's brain. The bleeding and swelling in Farmer's brain was significant to the extent that the attending neurosurgeon placed a ventricular drain, which was used to relieve and monitor pressure in his brain. However, the bleeding in Farmer's brain continued to worsen, necessitating a hemicraniectomy in which the neurosurgeon removed a large part of the left side of Farmer's skull to allow for increased swelling of the brain. Farmer spent seven months following the attack confined to hospital beds until he ultimately succumbed to his injuries on April 19, 2012. The cause of death was "[i]nfectious complications following blunt force trauma of [the] head."
At the defendant's sentencing hearing, the Supreme Court noted that it had read the materials submitted by the defendant, including a number of letters from the defendant's family and friends, and acknowledged that the defendant did not have a prior criminal history. The court also noted that it had read the presentence report, which indicated that the defendant had a difficult upbringing. However, the court found that while the defendant may have been, at least initially, under the genuine belief that there was a burglary in progress when Farmer came to his door, that did not justify the defendant's conduct. The court stated, among other things, that the defendant had set out on a "manhunt" for Farmer, who did not at any point verbally or physically threaten the defendant, or attempt to use physical force against the defendant. In addition, the court noted the severe injuries inflicted upon Farmer, and found that the defendant "seem[ed] to minimize his culpability." Nevertheless, the court declined to sentence the defendant to the maximum term of imprisonment of 25 years, as requested by the People. Instead, the court, "taking into account all the factors in the case," including the letters of support, the presentence report, and the victim impact statement, sentenced the defendant to a determinate term of imprisonment of 15 years.
"The determination of an appropriate sentence requires the exercise of discretion after due consideration given to, among other things, the crime charged, the particular circumstances of the individual before the court and the purpose of a penal sanction, i.e., societal protection, rehabilitation and deterrence" (People v Farrar, 52 NY2d 302, 305; see People v Suitte, 90 AD2d 80, 83). The sentencing court "is in the most advantageous position to determine the proper sentence, having observed the defendant and being intimately familiar with the facts and circumstances underlying the conviction" (People v Junco, 43 AD2d 266, 268, affd 35 NY2d 419; see People v Suitte, 90 AD2d at 85). However, "[a]n intermediate appellate court has broad, plenary power to modify a sentence that is unduly harsh or severe under the circumstances" (People v Delgado, 80 NY2d 780, 783).
Under the circumstances of this case, the sentence imposed, which fell in the middle of the statutorily permissible range (see Penal Law § 70.02[2], [3][a]), was neither harsh nor excessive. The record reflects that the crime was unprovoked. As the sentencing court observed, "[a]nyone could have gone to the wrong door of an unfamiliar apartment and jostled that door and found [them]selves in the same sort of situation [as Farmer]." While the defendant claimed at trial that he thought he was being burglarized, other than briefly jostling the door, there was no reasonable view of the credible evidence that Farmer was attempting to commit a burglary. Notably, although [*4]the defendant testified at trial that Farmer had stepped into his apartment, this was inconsistent with the information he had provided to the police in his earlier videotaped statement. Furthermore, the defendant's own testimony reflected that, at the time he left his apartment to search for Farmer, any possibility of burglary had terminated. After ensuring that no one had entered his apartment and that the door was locked, the defendant left his apartment and, as noted by the court, set out on a "manhunt" for Farmer. The defendant also admitted then when he encountered Farmer, he immediately set upon Farmer despite Farmer's attempts to explain that he had made a mistake.
Further, the circumstances of the crime were particularly violent. The evidence revealed that the defendant repeatedly kicked and stomped Farmer, as indicated by the multiple impact sites to Farmer's head and brain, and the bloody footprint on his shirt. The medical testimony reflected that Farmer suffered significant head trauma. As the sentencing court observed, Farmer likely experienced pain "as a result of the various medical intrusions that were necessary and the resulting infections from those intrusions which ultimately took his life, not to mention the pain that he felt when he was lying there in a pool of his own blood in the lobby and [the] defendant did nothing to help him." While the defendant stated at sentencing that he was "sorry for what happened," the presentence report indicated that the defendant denied his guilt to the Probation Department. The fact that the defendant left Farmer bleeding and motionless at the scene of the attack without calling the police and thereafter denied his guilt is indicative of a lack of remorse for his actions.
The transcript from the sentencing hearing reflects that the Supreme Court carefully weighed the appropriate factors in reaching its sentencing determination (see People v Watson, 163 AD3d 855). Under the circumstances, it cannot be said that there was an abuse of discretion, or that the sentencing court failed to observe sentencing principles, and I discern no reason on this record to impose a different sentence from that of the sentencing court (see People v Suitte, 90 AD2d at 86).
I agree with the majority in all other respects.
Accordingly, I would affirm the judgment of conviction.
ENTER:
Aprilanne Agostino
Clerk of the Court