People v Adorno (2022 NY Slip Op 05856)

People v Adorno

2022 NY Slip Op 05856

Decided on October 19, 2022

Appellate Division, Second Department

Dillon, J.p.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on October 19, 2022
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

MARK C. DILLON, J.P.
FRANCESCA E. CONNOLLY
VALERIE BRATHWAITE NELSON
SHERI S. ROMAN
PAUL WOOTEN, JJ.

2019-10659
 (Ind. No. 1796/18)

[*1]The People of the State of New York, respondent,
v
Angelo Adorno, appellant.

Appeal by the defendant from a judgment of the Supreme Court (Charles S. Lopresto, J.), rendered August 22, 2019, and entered in Queens County, convicting him of robbery in the first degree and criminal possession of stolen property in the fifth degree, upon a jury verdict, and imposing sentence.

Twyla Carter, New York, NY (David Crow and Kramer Levin Naftalis & Frankel, LLP [Aaron L. Webman and Thomas M. Twitchell], of counsel), for appellant.
Melinda Katz, District Attorney, Kew Gardens, NY (Johnnette Traill, Ellen C. Abbot, and Jordan I. LoCascio of counsel), for respondent.

DILLON, J.P.

OPINION & ORDER
This appeal provides our Court with an opportunity to highlight the need for attorneys at trial to interpose objections that are prompt, timely, and specific.
I. Relevant Facts
The facts underlying this appeal are, for the most part, not in dispute. The defendant was charged, under Queens County Indictment No. 1796/18, with robbery in the first degree (Penal Law § 160.15[3]), robbery in the second degree (id. § 160.10[2][a]), criminal possession of stolen property in the fifth degree (id. § 165.40), and criminal possession of a weapon in the fourth degree (id. § 265.01[2]). The charges arose out of an incident that occurred on August 4, 2018, at a Key Food store in Queens. According to the evidence, the defendant was observed that day secreting four packages of steak into his backpack, and leaving the store after paying for bread but not paying for the merchandise in his backpack. The theft was videotaped by the store.
Security guard Mustafa Elmwafy was dispatched by a supervisor to follow the defendant to the parking lot and confirm the theft. In the parking lot, the defendant refused to return the steaks, pushed Elmwafy's chest, and told Elmwafy to "go away." An altercation ensued between [*2]the defendant, Elmwafy, and two other store employees who came to the parking lot. During the ongoing altercation, the defendant pricked Elmwafy with a hypodermic needle that he had on his person, which drew blood in the area of Elmwafy's torso and shirt. Elmwafy yelled, "he stung me, he stung me." Elmwafy's supervisor, Ashraf Najjar, who had arrived at the scene of the altercation, observed the needle in the defendant's hand while Elmwafy "was holding his hand trying to prevent him [the defendant] from stabbing him [Elmwafy]," and later observed the blood at Elmwafy's puncture hole. According to Najjar, the defendant was brought to the ground and the needle taken from his hand and kicked away. The defendant was held pending the arrival of police, while physically struggling, resisting, cursing, and screaming.
Elmwafy, who was 19 years old at the time, was taken to Wyckoff Hospital where he was treated for two to three hours, given some pills, and prescribed antiviral medicine which he needed to take twice a day for a week. He also missed one week of work.
At jury selection, one prospective juror, who was not ultimately selected to serve on the jury, disclosed during voir dire that an "ex" was a police officer who was stabbed with a needle in the line of duty by a "crackhead" and thereafter contracted HIV/AIDS, which ultimately ended their relationship.
The defendant did not testify on his own behalf or present other evidence.
At the conclusion of the evidentiary portion of the trial, the Supreme Court determined that it would not charge the jury on the elements of robbery in the second degree, as the evidence failed to establish the necessary element of "physical injury" as defined by Penal Law § 10.00(9). The defendant conceded the commission of a petit larceny (id. § 155.25).
During summation, defense counsel argued that there was no unbiased evidence that Elmwafy was stuck by a needle wielded by the defendant, and that Elmwafy was not pricked by the needle in the way that he described. The parking lot video that was in evidence did not depict anything specific to the needle, as a crucial segment of the altercation was obscured by the presence of a van.
A portion of the prosecutor's summation was responsive to that argument, with the prosecutor maintaining that the testimonies of Elmwafy and Najjar about the circumstances of the needle were credible. In discussing Elmwafy being stuck with a needle, the prosecutor argued that a hypodermic needle can be dangerous. Indeed, the use of a "dangerous instrument" is an element of both robbery in the first degree and criminal possession of a weapon in the fourth degree, which were among the charges that would be submitted to the jury (Penal Law §§ 160.15[3]; 265.01[2]).
The prosecutor specifically remarked that a hypodermic needle is "designed to . . . puncture the human skin and inject or withdraw, but often inject something into the body." There was no objection from the defense. The prosecutor uttered four more sentences about the nature of needles, without any objection from the defense. The prosecutor then said of any needle that "[i]t can put stuff that can kill you." There was no objection from the defense. "It can put stuff in there that injures you." There was no objection from the defense. "We were all here in jury selection when the individual talked about what happened to his partner which is the needle stick." There was no objection from the defense. "It is capable of causing serious physical injury, death, serious bodily harm, depending on how it's used." There was no objection from the defense. "And if you take this and you just stick someone with it that makes it a dangerous instrument." There was still no objection from the defense. "It's important, just like you can take I submit any object, depending on how it's used, a car, a baseball bat for hitting balls, you take it to someone's body, turns into a dangerous instrument." Again, defense counsel did not object. "You take a needle, you stick it in someone's arm, you give them life saving medicine. That's proper use. You take it and stick them and possibly infect them with a deadly disease, something that ruins their life, dangerous instrument."
At that juncture, defense counsel objected "to all of this." The Supreme Court sustained the objection by striking the prosecutor's last statement regarding "dangerous instrument," explaining that there was "no evidence to support any type of dangerous instrument." In response, defense counsel reiterated by saying, "No evidence." The prosecutor retorted that "It's about how it could be used," prompting defense counsel to state, "Objection. Speculation." The court explained that the objection had already been sustained and that "[w]e're on to the next thing."
After the jury was charged and deliberating, defense counsel raised the issue of the Supreme Court's handling of the above-referenced objection, arguing that the prosecutor's remarks about the needle appealed to the emotion and sympathy of the jury. The court noted that counsel had not objected to those remarks. Tellingly, defense counsel stated that the "defense eventually did object to that whole portion of his summation" (emphasis added). The court disagreed, stating that "you were silent in the first portion of that, so you allowed one portion of it and then you objected later." The court asked rhetorically, "What part are you objecting to that he said?" and further noted to counsel that "[y]ou didn't object at that point. You objected later on when he described what the needle is capable of doing under such circumstances."
The defendant was convicted of the class B violent felony of robbery in the first degree (Penal Law § 160.15[3]) and the class A misdemeanor of criminal possession of stolen property in the fifth degree (id. § 165.40). He was acquitted of the charge of criminal possession of a weapon in the fourth degree (id. § 265.01[2]).
The defendant faced a sentence on the robbery conviction of a determinate term of imprisonment of between 5 and 25 years (see id. § 70.02[1][a], [3][a]). The defendant's criminal history consisted of 3 prior felony convictions, 16 misdemeanor convictions, 5 parole revocations, and 1 revocation of probation. He was not cooperative with the Department of Probation during its efforts to prepare a presentence report. The defendant was sentenced to a determinate term of imprisonment of seven years, to be followed by a period of postrelease supervision of five years on the conviction of robbery in the first degree, and a definite term of imprisonment of one year on the conviction of criminal possession of stolen property in the fifth degree, to run concurrently with each other. The defendant's conviction of criminal possession of stolen property in the fifth degree and the sentence imposed thereon is not raised as an issue on appeal.
II. The Prosecutor's Summation
The defendant argues on appeal that the prosecutor's reference to the content of a prospective juror's voir dire, which was not in evidence, was misconduct, as it was an egregious appeal to emotion and sympathy designed to inflame the jury and prejudice the defense.
The objection of defense counsel most relevant to this appeal was to "all of this," which was interposed only after the prosecutor likened a hypodermic needle to a dangerous instrument. The objection, as interposed, suffers from a number of problems in failing to preserve the issues now raised on appeal. First, the objection was vague and ambiguous. Second, it was untimely. Third, its language was general and nonspecific. The preservation rules discussed below, requiring that objections be timely and specific rather than untimely and general, are basic, well-understood, and time-tested concepts, which should prompt no dispute in their application to this appellate record.
A. The Objection Was Vague and Ambiguous
The defendant's objection was vague and ambiguous, as it is necessarily unclear how far back into the prosecutor's summation "all of this" might conceivably go (see People v Jones, 284 AD2d 46, 48, affd 99 NY2d 264). The prosecutor had been speaking at some length, for a total of 28 uninterrupted sentences, before defense counsel interposed the objection at issue here. After the prosecutor made reference to the prospective juror, 6 more sentences followed until the subject objection was made. In the context of an extended 28-sentence narrative, the trial court and the [*3]Appellate Division cannot be expected to speculate about how far back in the prosecutor's summation an objection is intended to encompass, including whether the objection was intended to encompass one particular sentence involving the prospective juror's voir dire 7 sentences earlier. An issue is not preserved by a vague objection (see People v York, 133 AD2d 130, 133; People v Santiago, 108 AD2d 939).
B. The Objection Was Untimely
The Court of Appeals has spoken consistently and often on the need for objections to be voiced by counsel in a timely manner. Here, counsel's far-flung objection to "all of this" was untimely as to any remarks of the prosecutor that preceded the sentence actually objected to (see People v Allende, 34 NY3d 996, 1005; People v Jackson, 29 NY3d 18, 22). As noted by the Court of Appeals, a timely objection alerts all parties to an alleged deficiency, and advances the goal of swift and final determinations of the guilt or nonguilt of a defendant (see People v Gray, 86 NY2d 10, 21). The failure to interpose a timely objection "consigns the objection to permanent repose" (People v Jordan, 96 AD2d 1060, 1061 [internal quotation marks omitted], affd 62 NY2d 825).
The record here demonstrates that the prosecutor completed two sentences about the dangers of needle sticks, without objection, followed by the complained-of sentence about the prospective juror's voir dire, without objection, followed by yet another sentence about needles, also without objection. Only after the prosecutor made five further statements ending with a reference to a needle being a dangerous instrument was an objection finally interposed. As to that objection and its timing, the Supreme Court understandably treated it as applying to the last occurring statement of the prosecutor, which was that a needle could be a "dangerous instrument" when it is used to stick someone "and possibly infect them with a deadly disease, something that ruins their life," without evidence that was so. The defendant received a prompt ruling from the court striking the prosecutor's comments, as there was no evidence to support the statement. Further, no exception was noted, the defendant did not argue that the court failed to address the entirety of the objection, and no mistrial was requested (see People v Heide, 84 NY2d 943, 944; People v Medina, 53 NY2d 951, 952; People v O'Keefe, 105 AD3d 1062, 1064; People v Hollenquest, 48 AD3d 592, 593; People v Almonte, 23 AD3d 392, 394).
Moreover, on this point, after the Supreme Court sustained the objection and struck the prosecutor's comments about "dangerous instrument," defense counsel, evidently expressing agreement, repeated "No evidence," the very words used by the court regarding the "dangerous instrument" argument. Nonetheless, the People, still focusing on the dangerous instrument element of certain charges, argued that "[i]t's about how [the needle] could be used." That prompted a further objection from defense counsel on the specific ground of "[s]peculation," followed by a continuing discussion with the court focused solely and squarely on whether a needle is a dangerous instrument. The court reiterated that the objection on that issue had already been sustained. A reasonable reading of the colloquy demonstrates that at the time, the substance of the objection, the discussion, and the court's ruling, were exclusively focused on the prosecutor's reference to a needle being a "dangerous instrument" (see People v Nuccie, 57 NY2d 818 [colloquy over objection was to an issue other than that raised on appeal]), which, as noted, had been stricken from the record by the court. There was simply no specific objection to anything else, and certainly no objection to the reference about the prospective juror uttered several sentences earlier (see CPL 470.05[2]).
C. The Objection Was Impermissibly General and Nonspecific
For preservation, the defendant's objection was also general, as it did not identify to the Supreme Court any particular argument or remark by the prosecutor or any specific basis. The basis for the objection was not explained, rendering the entire objection general and insufficient for preservation purposes (see id.; People v Romero, 7 NY3d 911; People v Tonge, 93 NY2d 838; People v Dien, 77 NY2d 885). As stated by the Court of Appeals in Tonge, "a party's failure to [*4]specify a basis for a general objection renders the argument unpreserved for [appellate] review" (People v Tonge, 93 NY2d at 839-840; see People v O'Keefe, 105 AD3d at 1064; People v Brooks, 89 AD3d 746, 747). Objections must instead be made with sufficient specificity so as to give the court an opportunity to consider and deal with the asserted error (see People v Robinson, 88 NY2d 1001, 1002).
Defense counsel's ultimate objection was instead general, unspecific, and insufficient to enable the Appellate Division to devine its basis and thereby determine whether it was properly ruled upon by the trial court (see People v Rivera, 73 NY2d 941; People v Ford, 69 NY2d 775, 776). This is true of any and all portions of the passage at issue on appeal here, even including the prosecutor's remark on which an objection was ultimately interposed and ruled upon by the Supreme Court. The circumstances here are strikingly similar to those addressed by the Court of Appeals in People v Nuccie (57 NY2d 818), where the defendant's general, unelaborated objection to alleged prejudicial and defamatory statements made by the prosecutor in summation was inadequate to preserve the issue for appellate review.
D. Subsequent Colloquy Did Not Revive the Untimely Objection
Defense counsel initiated further colloquy with the Supreme Court about the subject objection after the jury had been charged and after the jury had begun its deliberations. By then, counsel's objection was clearly untimely, as there was no longer an opportunity for the court to promptly make a curative ruling to the jury, had one even been indicated. Defense counsel raised the issue of the prosecutor's improper reference to the prospective juror's voir dire for the first time, during this colloquy, while the jury was deliberating.
During this colloquy, the Supreme Court explained that the prosecutor's earlier remarks, including those involving the prospective juror, continued without objection from the defense even though, in the words of the court, "I was waiting for you to object to it and there was none." The court correctly noted as the jury was deliberating that no objection had been made by defense counsel to the prosecutor's mention of the prospective juror's remarks during voir dire. That undisputable underlying fact, as accurately noted by the court, renders the issue unpreserved for appellate review (see CPL 470.05[2]; People v Hughes, 199 AD3d 937, 938). The court's understanding of the sequence of events was corroborated by defense counsel's own later implicit concession regarding untimeliness, that she had "eventually" objected to an entire portion of the summation.
The foregoing construct, that the defendant failed to preserve any objection to the prosecutor's reference to the prospective juror's void dire, is supported by the holding in People v Balls (69 NY2d 641), where, identical to what occurred here, defense counsel interposed a general objection during a prosecutor's summation, which, unlike here, was followed by a postsummation motion for a mistrial. In Balls, the Court of Appeals determined that as the defendant's objection during the prosecutor's summation was merely general, not even the later motion for a mistrial was sufficient to preserve any summation issues for appellate review. If, in the judgment of the Court of Appeals, a specific remedial motion for a mistrial fails to preserve for appeal general objections made during an earlier summation, then the mere colloquy of defense counsel here must be viewed to be insufficient as well.
Defense counsel's belated objection made after the jury was already deliberating was, in and of itself, untimely (see People v Beatty, 129 AD3d 495; People v Alvarado, 126 AD3d 803, 805; People v Watson, 292 AD2d 247). While our colleagues in the dissent cite to People v Brown (79 AD3d 1142) for the proposition that general objections to summation remarks may be reviewed when specifically objected to in postsummation argument, Brown is both inapposite and inapplicable for two reasons, assuming it may even be reconciled with the Court of Appeals' pronouncement in People v Balls (69 NY2d 641). First, as already noted, no underlying objection had actually been [*5]voiced to the disputed remarks about the propective juror during the prosecutor's summation, and there was therefore no objection to revive by defense counsel's later evaporative colloquy.
Second, People v Brown (79 AD3d 1142), as relied upon by the dissent, is not controlling under the facts presented here. In Brown, defense counsel made general objections to certain summation comments of the prosecutor. Defense counsel then moved for a mistrial immediately after the conclusion of the prosecutor's summation, pointing to specific alleged misconduct during that summation in support of the requested mistrial, at a time when the Supreme Court could remedy the alleged misconduct by means of potentially granting the motion (see CPL 470.05[2]). In contrast, no motion for a mistrial was made in the instant matter. Our colleagues in the dissent refer to this point as a distinction without a difference, but respectfully, in doing so, miss the distinction that here, unlike Brown, the defendant's postsummation colloquy provided the Supreme Court with no opportunity to impactfully address its substance, as the jury was already in the midst of its deliberations (see People v Jones, 284 AD2d at 49-50 [belated and untimely Batson challenge during jury pool four to a juror already selected in pool one]). The prosecutor's summation to the jury which was the subject of defense counsel's later colloquy had already been completed, the jury had been charged, and the proverbial horses were out of the barn, rendering the discussion clearly untimely. Those circumstances are easily distinguishable from a motion for a mistrial as in Brown, and in People v Romero (7 NY3d 911 [motion for mistrial]), as cited as authority by Brown, where a potential grant of the motion based upon a then-specified objection would provide an immediate remedy and advance the goal of a swift and final determination of the proceeding (see People v Gray, 86 NY2d at 21).
In sum, the defendant's argument on appeal is unpreserved for appellate review for three independent reasons—the objection was ambiguous, not timely made as to the remark about the prospective juror, and was general rather than specific. We use this occasion to remind the bar that objections, in order to be preserved for appellate review, must be clear, timely, and specific to the issue complained of (see People v Tonge, 93 NY2d at 839; People v Dien, 77 NY2d 885; People v Cabassa, 188 AD3d 716), and presented in a manner that enables the court to promptly rule upon them and cure any potential prejudice that might otherwise arise (see People v Narayan, 54 NY2d 106, 112; People v Chatman, 14 AD3d 620; People v Coleman, 114 AD2d 906). The objection here, purportedly interposed as to the statement regarding the prospective juror's voir dire, meets none of those basic and time-tested requirements. Defense counsel's objection, being merely ambiguous and general, as well as untimely, did not apprise the Supreme Court of the subject matter so as to lend itself to a knowing and immediate cure by the court (see People v Williams, 29 NY3d 84, 89; People v Tonge, 93 NY2d at 839). The colloquy between defense counsel and the court that immediately followed the objection was focused solely on the issue of "dangerous instrument." Contrary to the interpretation of our colleagues in the dissent, defense counsel's "[n]o evidence" comment did not constitute a specific objection to the reference to the prospective juror's voir dire, but was merely a reflexive response buttressing the court's ruling on the objection.
III. The Defendant's Convictions Are Consistent
The defendant does not argue on appeal that his conviction of robbery in the first degree is inconsistent with his acquittal on the count of criminal possession of a weapon in the fourth degree. Nor do our colleagues in the dissent make such an argument. Indeed, the defendant's conviction of robbery in the first degree may, in fact, be reconciled with his acquittal on the charge of criminal possession of a weapon in the fourth degree. Specifically, the jury could have concluded on the robbery charge that the defendant, without intending to do so, used or threatened to use the needle in a manner capable of causing death or other serious physical injury (see Penal Law §§ 10.00[13]; 160.15[3]), while at the same time concluding on the weapon possession charge that the People failed to prove the defendant's intent to actually use the needle unlawfully against Elmwafy [*6](see id. § 265.01[2]). The element of intent is different for the two crimes and it is possible for a defendant to be convicted of one while being acquitted of the other (see People v Johnson, 130 AD2d 767, affd 70 NY2d 819).
Nonetheless, our colleagues in the dissent argue that "it is highly likely that the jurors were influenced by the prosecutor's . . . remarks" about the dangerousness of the needle stick. We disagree with that assessment.
The use or threat to use the needle, as relevant to the count of robbery in the first degree, could be inferred from the description of events provided in the testimonies of Elmwafy and Najjar, particularly Najjar's testimony that the defendant was holding the needle up, which, from the jury's viewpoint, might have only incidentally prompted Elmwafy to raise his hands in defense. There was also trial evidence that, as a result of the needle stick, Elmwafy was treated at a hospital and prescribed antiviral medications which needed to be taken twice a day for a week. Thus, the jury's verdict on the robbery and weapon possession counts may be supported, and in fact reconciled, by the trial evidence itself, without any regard at all to the prosecutor's statement during summation about the prospective juror's voir dire. We therefore discern no specific or sufficiently credible basis for reaching the objection issue in the exercise of our interest of justice jurisdiction (see CPL 470.15[6][a]; People v Goldston, 126 AD3d 1175, 1177; People v Belgrave, 209 AD2d 629, 629-630; People v Guillot, 205 AD2d 705).
IV. The Prosecutor's Remark Does Not Warrant a Reversal
Even if we were to reach the issue, we would find that the prosecutor's isolated summation remark about comments made by a prospective juror during jury selection, to the extent it was improper, was not egregious or unduly prejudicial so as to deprive the defendant of a fair trial (see People v Rodriquez, 202 AD3d 999; People v Mahon, 188 AD3d 915, 917; People v Moore, 60 AD3d 787).
Every juror knows from common life experience the risks that may attend from being stuck by a random needle, whether at a medical facility, a garbage dump, or as relevant here, from an unknown person on a city street. The prosecutor's fleeting reference to the statement made by a prospective juror during voir dire several days earlier did not specifically mention particular details about the prospective juror's partner, or HIV/AIDS, or the effect of that event on the relationship between the prospective juror and his partner. The prosecutor's remark was a single sentence that did not dwell on any of the particulars of the voir dire. The argument that the prosecutor's remark was unduly prejudicial, or made a difference to the verdict, is unpersuasive, as it merely reflected a matter of well-understood common knowledge and human experience (see People v Nelson, 215 AD2d 782 [hypodermic needle]; see also People v Brown, 126 AD3d 516, 519 [hypodermic needle], revd on other grounds, 28 NY3d 392; Matter of Markquel S., 93 AD3d 505 [pencil as dangerous instrument]). The remark was not so egregious, flagrant, or pervasive as to have deprived the defendant of a fair trial (see People v Cagan, 185 AD3d 836, 838; see also People v Mohabir, 192 AD3d 1047, 1048; People v Ortiz, 189 AD3d 891, 892; People v Sedeno, 188 AD3d 1269, 1270; People v Escamilla, 168 AD3d 758, 760; People v Gomez, 153 AD3d 724, 725-726; People v Persaud, 98 AD3d 527).
Interestingly enough, defense counsel, in her own summation, thought it proper to refer to "our conversation from jury selection." In doing so, defense counsel expressly drew the jurors' attention to a "boy who got jumped for his sneakers" and a "woman who went into Duane Reade and stole some lipsticks." Counsel referred to these two episodes described during jury selection in support of her assertion that "[j]ust because a person is a thief does not automatically mean that they would resort to violence to steal or to keep the stolen property." In contrast, the prosecutor's reference to a prospective juror's statement during jury selection, which the defendant describes on appeal as egregious misconduct, was, in fact, more fleeting than defense counsel's own [*7]dive into the same jury selection in an effort to make a point.
Also, contrary to the defendant's argument on appeal, the prosecutor's remark was not a "safe streets" argument disapproved by the courts (see e.g. People v Brisco, 145 AD3d 1028, 1030), as the prosecutor was merely trying to argue that the hypodermic needle was a dangerous instrument and was not suggesting that the community at large must be protected from the defendant (see People v Brown, 17 NY3d 742, 743; People v Young, 141 AD3d 551, 552; People v Caba, 101 AD3d 896).
Finally, the Supreme Court instructed the jury immediately prior to the commencement of summations that:
"you are the finders of the facts in this case and it's for you and you alone to determine the facts from the evidence that you find to be truthful and accurate. And thus you should remember that whatever the lawyers say and however they say it is simply argument submitted for your consideration. Remember the lawyers are not witnesses in this case. So if a lawyer suggests as fact something that's not based on the evidence you must disregard it. Remember nothing the lawyers say at any time is evidence. So nothing the lawyers say in their summations is evidence" (emphasis added).
"Jurors are presumed to follow the legal instructions they are given" (People v Johnson, 159 AD3d 833, 834; see People v Batticks, 35 NY3d 561, 568; People v Morgan, 28 NY3d 516, 520-521; People v Baker, 14 NY3d 266, 274). As there is nothing in the record indicating that the jury disregarded this instruction, the challenged comment by the prosecutor did not prejudice the defendant or undermine his right to a fair trial (see People v Rodriquez, 202 AD3d at 999; People v Brooks, 89 AD3d at 747).
V. The Sentence Was Not Excessive
The defendant's sentence was not excessive (see People v Suitte, 90 AD2d 80), and on this issue we also respectfully depart from the view of our colleagues in the dissent.
Upon the defendant's conviction of robbery in the first degree, which is a class B violent felony (Penal Law §§ 160.15[3]; 70.02[1]), the defendant was subject to a minimum determinate term of imprisonment of 5 years and a maximum determinate term of imprisonment of 25 years (see id. § 70.02[3][a]). Here, the sentence imposed of 7 years was two years above the minimum sentence, near the very low end of the permissible spectrum. The low-end sentence was imposed despite the fact that the defendant's criminal history included 3 felony convictions, 16 misdemeanor convictions, 5 parole revocations, and 1 revocation of probation.
Moreover, the seriousness of the defendant's conduct in this matter should not be understated. The trial evidence showed that the defendant wielded a hypodermic needle that pricked Elmwafy when he sought to retrieve stolen merchandise from the defendant near the scene of the crime. Additionally, according to the presentence report, the defendant failed to appear for a requested video teleconference with the Department of Probation, thus precluding the probation officer from obtaining a statement from the defendant and requiring it to obtain information regarding his residential and social history and mental and physical health information from a previous probation officer. The Supreme Court assessed the defendant as being "a violent person and a danger to the community and public safety."
The often-cited case from this Court of People v Suitte (90 AD2d 80) reminds us that appellate review of criminal sentences is to be of a "limited nature" (id. at 85), in acknowledging that the "sentencing decision is a matter committed to the exercise of the [sentencing] court's discretion" and that "[a] reviewing court lacks some of the first-hand knowledge of the case that the sentencing Judge is in a position to obtain" (id. [emphasis and internal quotation marks omitted]). "The penalty [*8]to be imposed is a matter for the trial court's broad discretion within the limits imposed by the Legislature" (id. at 88). Thus, the decision of the sentencing court is entitled to deference (see id.). As noted by this Court in People v Janvier (186 AD3d 1247), "[o]ur role as intermediate appellate court justices is . . . not to examine a sentence as if we are acting de novo, and not to reduce a sentence if we might merely have been inclined to impose a more lenient sentence if we had been in the trial judge's chair" (id. at 1249-1250).
Upon our review of the above-described facts and the other facts of the case, and upon consideration of all relevant sentencing factors (see People v Farrar, 52 NY2d 302, 305), the Supreme Court, on the conviction of robbery in the first degree, providently exercised its discretion in imposing a sentence of a determinate term of imprisonment of seven years, a mere two years above the statutory minimum. The sentence was within the statutory guidelines and was not excessive (see People v Aragundi, 194 AD3d 733, 736; cf. People v Samuel, 191 AD3d 808). We discern no reason to exercise our interest of justice jurisdiction to interfere with or substitute our judgment for that of the sentencing court and reduce the sentence.
VI. Miscellaneous
Videos of the defendant on the ground while being held for the police have no relevance to the jury's verdict, as the defendant had completed the elements of robbery in the first degree and criminal possession of stolen property in the fifth degree before the defendant was held by Key Food store employees. Moreover, the postcrime video has questionable relevance to the sentence imposed by the Supreme Court upon the defendant for his Penal Law violations.
The defendant's remaining contentions regarding other aspects of the prosecutor's summation were either responsive to defense counsel's summation and within the bounds of permissible rhetorical comment (see People v Davis, 178 AD3d 946, 947; People v Carmichael, 170 AD3d 742, 743; People v Gurdon, 153 AD3d 1430, 1431), or were not so egregious as to deprive the defendant of a fair trial (see People v Cagan, 185 AD3d at 838).
VII. Conclusion
For the foregoing reasons, the defendant received a fair trial from the Supreme Court and a jury of his peers, and his sentence was not excessive. Accordingly, the judgment is affirmed.
CONNOLLY and ROMAN, JJ., concur.
ORDERED that the judgment is affirmed.
WOOTEN, J., dissents, and votes to reverse the judgment, on the law, and order a new trial, with the following memorandum, in which BRATHWAITE NELSON, J., concurs:
I respectfully dissent and vote to reverse the judgment based upon prosecutorial misconduct during summation. In any event, I conclude that the incarceration portion of the sentence imposed on the conviction of robbery in the first degree was excessive, and should be reduced from a determinate term of imprisonment of seven years to a determinate term of imprisonment of five years.
I. Factual Summary
A. Circumstances of the Crime
On August 4, 2018, at approximately 6:30 p.m., the 57-year-old defendant was in a Key Food supermarket at 60-16 Myrtle Avenue in Queens (hereinafter the store). The defendant placed several packages of steak inside a messenger bag, which he closed and held over his shoulder. The total value of the steaks was estimated to be approximately $50. The defendant then went to the check-out counter, where he purchased a loaf of bread, but did not pay for the steaks before leaving.
The store manager, Ashraf Najjar, who observed the defendant placing items in his [*9]bag, advised a 19-year-old security guard, Mustafa Elmwafy, that he had "seen something suspicious." No employees of the store asked to check the defendant's bag or questioned the defendant before he left the store. After the defendant went outside, Najjar instructed Elmwafy to "follow" and "[o]bserve" the defendant from "a distance," "but don't make any trouble with him," while Najjar reviewed a videorecording of the theft.
Walking behind the defendant, Elmwafy followed him through a parking lot at the rear of the store onto Summerfield Street, and then continued walking for nearly a block on the sidewalk, without asking the defendant to stop. Eventually, Najjar and two other store employees ran out of the store through the parking lot toward Summerfield Street.
Around that time, Elmwafy approached the defendant. At trial, Elmwafy did not indicate that he identified himself to the defendant as an employee of the store. Elmwafy testified that he told the defendant to "give me [the] merchandise," and the defendant told him to "go away." Elmwafy, who testified in Arabic through an English interpreter, claimed that he spoke in English during the confrontation.
Elmwafy further testified that he reached his hand into the defendant's bag to retrieve the steaks, and Elmwafy and the defendant got into a struggle, during which Elmwafy got "pricked . . . with a needle." According to Elmwafy, it was "not that painful."
Although Elmwafy testified before the grand jury that the defendant "grabbed the needle from the bag and used it to threaten me," Elmwafy acknowledged at trial that he "didn't see the needle" until after he was pricked. Video surveillance of the area was unable to capture Elmwafy getting pricked by the needle, since Elmwafy and the defendant were standing behind a van which obstructed the camera's view at that time.
Najjar, who did not see Elmwafy get pricked by the needle, testified that when he caught up to the defendant and Elmwafy, "their backs were turned to me so I couldn't see what was going on." Najjar indicated that, after he "went around them" to "see what was going on," it "looked like . . . [the defendant] was trying to go and stab [Elmwafy]." Najjar stated that he "threw [the defendant] on the ground" and kicked the needle away, while Elmwafy testified that he and Najjar "knock[ed the defendant] down" "because of him hitting me with a needle, and . . . because of the things that he took from the store." Around that time, two other store employees arrived and Najjar called the police.
Elmwafy testified that once the defendant was on the ground, "[w]e tried to subdue him . . . , but he was trying to get away, and we were . . . keeping him there until the police came." Najjar also claimed the defendant was "fighting" while on the ground and "we tried to restrain him."
The portion of the incident when the defendant was lying on the ground was captured by video surveillance. The video shows the defendant being pinned face down in the street by four store employees for a period of approximately eight minutes before the police arrived. There is no indication from the video that the 57-year-old defendant ever attempted to fight back or offered any resistance other than to periodically attempt to lift his head or sit up. The video also clearly depicts the store employees kicking the defendant, kneeling on the defendant by the area of his head or neck, and standing on the defendant's hands or wrists on multiple occasions. Most of these instances of physical force occurred after the needle was already out of the defendant's reach, and after one of the store employees could be seen holding the defendant's bag and setting it down on the ground. Once the police arrived, the employees backed away from the defendant, who made no attempt to flee. The defendant was then arrested, without any resistance.
Elmwafy went to the hospital for examination, and he was discharged within two to three hours. Elmwafy stated that he "did not have pain" while at the hospital. The hospital discharge report reported Elmwafy's diagnosis as "accidental" "[n]eedle stick." The hospital discharge report indicated that Elmwafy tested negative for HIV, and there is no indication in the record that Elmwafy [*10]contracted any illnesses from the needle. As a precaution, Elmwafy was prescribed antiviral medication to take for one week, which caused him to experience dizziness, sleepiness for about a week, and moderate "belly pain" for three days.
B. The Trial
The defendant was charged by indictment with robbery in the first and second degrees, criminal possession of stolen property in the fifth degree, and criminal possession of a weapon in the fourth degree.
During jury selection, defense counsel advised a panel of prospective jurors that the trial would involve testimony from someone who was "stuck with a needle," which "might invoke some emotion." Defense counsel asked members of the panel if that testimony would make them "uncomfortable." One of the prospective jurors stated that his former partner was "stabbed" with a needle by "a crackhead" during an arrest, and that "a month later [his former partner] had HIV so we're not together."
After the prospective jurors left the courtroom, the prosecutor noted that the prospective juror "seemed to almost break down on the stand when he was talking about an ex-partner who was stabbed with a needle and got HIV." The prosecutor and defense counsel agreed that that prospective juror should be discharged for cause.
At trial, the People presented testimony from Elmwafy, Najjar, and Officer Christopher LeBlanc, who responded to the scene when the store employees were pinning the defendant to the ground.
Following the close of the evidence, the Supreme Court ruled that it would decline to submit a count of robbery in the second degree to the jury on the ground that there was no evidence to support a finding of physical injury to Elmwafy.
On summation, the prosecutor explicitly mentioned the prospective juror who indicated that his former partner was diagnosed with HIV after having been stabbed with a hypodermic needle. While arguing that the defendant used a needle as a "dangerous instrument" during the commission of the subject crime, the prosecutor stated the following:
"[A hypodermic needle is] designed to take a needle, puncture the human skin and inject or withdraw, but often inject something into the body. . . . It can put stuff that can kill you. It can put stuff in there that injures you. We all were here in jury selection when the individual talked about what happened to his partner which is the needle stick. It is capable of causing serious physical injury, death, serious bodily harm, depending on how it's used. . . . You take it and stick [a person] and possibly infect them with a deadly disease, something that ruins their life, dangerous instrument" (emphasis added).
Defense counsel objected to "all of this," and the Supreme Court ruled that the prosecutor's comments be stricken on the ground that "[t]here's no evidence to support any type of dangerous instrument." The prosecutor interjected "It's about how it could be used," to which defense counsel stated, "Objection. Speculation," and the court indicated, "I sustained the objection already. We're on to the next thing." The prosecutor then advised the jurors to "go back and use your common sense and judgment as to what a needle can do." Defense counsel interjected that the court had "just instructed the People to move on," and the court indicated that defense counsel's last objection was overruled.
Following summations, the Supreme Court issued the jury charge, and once the jury left the courtroom, the court invited defense counsel to elaborate on her objections to the prosecutor's summation. Defense counsel argued that the prosecutor "made an egregious appeal to [*11]emotion and sympathy when he was talking about the needle and talking about a previous prospective juror." The court responded that "[t]here was no objection to that," and "I was waiting for you to object to it." Defense counsel noted that an objection was raised to "that whole portion of [the prosecutor's] summation," and reiterated that "it was extremely prejudicial to [the defendant] and it was improperly invoking emotion." In response, the prosecutor asserted that "the People were merely pointing out based on one juror's statements and story that was elicited . . . on jury selection the fact that a needle . . . is capable of . . . causing serious injury, death, et cetera, depending how it's used." The court ruled that "I don't find anything wrong with my ruling and I agree with the People's assertion on what they were trying to prove." The court noted that "[f]or appellate purposes, the record stands" and "[the Appellate Court] may review it." Defense counsel added, "That was prosecutorial misconduct and in violation of [the defendant's] federal and constitutional rights," and the court replied that "[t]he record is protected."
During jury deliberations, the Supreme Court received several notes from the jury, including (1) asking the court to "re-read the grand jury testimony of the confrontation [between Elmwafy and the defendant,] and the defendant threatening the witness with a needle"; (2) asking "where the needle came from as [Elmwafy] was struggling with the defendant and how it happened"; (3) asking about "the difference between first degree robbery and petit larceny"; and (4) requesting a "readback on the definition of the law on criminal possession of a weapon."
In response to the jury notes, the Supreme Court advised the jurors, inter alia, that the "main distinction" between robbery in the first degree and petit larceny is that robbery involves the taking or retention of stolen property "by use or threatened use of a dangerous instrument." The court also instructed the jurors that a person is guilty of criminal possession of a weapon in the fourth degree "when this person knowingly possesses a dangerous instrument with intent to use the same unlawfully against another."
At the close of the trial, the defendant was convicted of robbery in the first degree and criminal possession of stolen property in the fifth degree, but he was acquitted of criminal possession of a weapon in the fourth degree.
II. Prosecutorial Misconduct
A. Preservation
On appeal, the defendant argues, inter alia, that he was deprived of a fair trial by remarks made by the prosecutor on summation, including the portion of the summation mentioning the prospective juror whose former partner contracted HIV from a needle. Contrary to the determination of my colleagues in the majority, the defendant's challenge to this portion of the summation was sufficiently preserved for appellate review.
Pursuant to CPL 470.05(2), "[f]or purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same." However, CPL 470.05(2) provides that "[s]uch protest need not be in the form of an 'exception' but is sufficient if . . . in re[s]ponse to a protest by a party, the court expressly decided the question raised on appeal." Thus, the Court of Appeals has recognized that a "general objection . . . is sufficient to preserve an issue for [appellate] review when the trial court expressly decided the question raised on appeal" (People v Parker, 32 NY3d 49, 57 [internal quotation marks omitted]; see People v Cantoni, 140 AD3d 782, 783). Further, "a party who without success has either expressly or impliedly sought or requested a particular ruling or instruction, is deemed to have thereby protested the court's ultimate disposition of the matter or failure to rule or instruct accordingly sufficiently to raise a question of law with respect to such disposition or failure regardless of whether any actual protest thereto was registered" (CPL 470.05[2]).
Here, "[r]egardless of whether defendant's objection . . . was sufficiently explicit," it cannot reasonably be disputed that the trial court "expressly decided the question raised on appeal" (People v Smith, 22 NY3d 462, 465 [internal quotation marks omitted]; see CPL 470.05[2]). Following summations, the Supreme Court invited defense counsel to elaborate on her objections to the prosecutor's summation remarks. Defense counsel then specifically argued that the prosecutor "made an egregious appeal to emotion and sympathy when he was talking about the needle and talking about a previous prospective juror that we had," and that the prosecutor's remark was "prosecutorial misconduct and in violation of [the defendant's] federal and constitutional rights." In response, the People asserted that they "were merely pointing out based on one juror's statements and story that was elicited . . . on jury selection the fact that a needle could have . . . caus[ed] serious injury, death, et cetera." The court ruled that "I agree with the People's assertion on what they were trying to prove. They were not trying to elicit emotion." Thus, the court "'was aware of, and expressly decided'" that the portion of the summation at issue was not an impermissible appeal to emotion, which was sufficient to preserve that issue for appellate review (People v Collins, 106 AD3d 1544, 1546, quoting People v Hawkins, 11 NY3d 484, 493; see People v Cantoni, 140 AD3d at 783; People v Lugg, 124 AD3d 679).
My colleagues in the majority assert that the circumstances of this case are "strikingly similar" to those in People v Nuccie (57 NY2d 818), in which "the defendant's general, unelaborated objection . . . was inadequate to preserve the issue for appellate review." However, Nuccie is distinguishable in three respects. First, Nuccie was decided in 1982, prior to the 1986 amendment to CPL 470.05(2). Prior to the amendment to CPL 470.05(2), "a party was unable to claim an error of law when seeking appellate corrective action unless the particular legal ground advanced on appeal had been specifically called to the attention of the trial court when the protest was made" (Peter Presier, Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 470.05 at 11 [1994 ed]). Second, in Nuccie, there is no indication that the trial court ever expressly decided the issue raised on appeal, whereas the issue raised on appeal in this case was expressly decided by the trial court. Third, as the Court of Appeals emphasized in Nuccie, an "associated colloquy" revealed that "the substance of the objection" pertained to a different issue than that raised on appeal (People v Nuccie, 57 NY2d at 819). In contrast, during the colloquy in this case, defense counsel raised the same challenge to the portion of the summation at issue which is raised on appeal, that the summation remark "was improperly invoking emotion."
Further, my colleagues in the majority suggest that defense counsel was required to immediately object to a "particular sentence" in a stream of related statements, without listening to the context in which that statement was made prior to raising an objection. However, the majority does not cite to any authority holding that the opportunity to raise an objection to a statement made during summation has passed as soon as the prosecutor moves on to speaking a new sentence. Nor should this Court adopt such an arbitrary rule so as to impose a limit on the precise number of sentences which may be uttered before an objection is raised, particularly where, as here, the sentences which followed were closely related to the statement at issue. Indeed, on appeal, the defendant quotes the statement involving the prospective juror along with statements spoken both before and after, since reading the statement at issue in a vacuum would deprive it of the full extent of the prejudicial impact which the remark conveys in context.
Moreover, defense counsel's objection "to all of this" cannot reasonably be construed as pertaining only to the immediately preceding sentence or to an isolated statement. The majority's reliance on People v Jones (284 AD2d 46, affd 99 NY2d 264) to assert that it is "unclear how far back" the objection to "all of this" goes is misplaced, as Jones did not involve a challenge to a summation remark. Rather, the Court in Jones determined that a vague Batson objection to a prospective juror (see Batson v Kentucky, 476 US 79) was insufficient to preserve a Batson claim [*12]for appellate review.
To the extent the People argue that defense counsel's specific objections raised during the postsummation colloquy were untimely, the People's contention is without merit. In People v Brown (79 AD3d 1142), this Court determined that a defendant preserved his challenge to summation remarks for appellate review where those remarks "were generally objected to during summation and specifically objected to in postsummation motions" (id. at 1142). My colleagues in the majority attempt to distinguish Brown on two grounds: first, that "no underlying objection had actually been voiced to the disputed remarks," and second, that no motion for a mistrial was made. With regard to the first point, as discussed previously, the majority's reading of defense counsel's objection to "all of this" as pertaining to only one or more sentences near the end of a paragraph in the transcript is arbitrary. Moreover, even assuming, arguendo, there was any doubt as to whether the objection to "all of this" pertained to the entire sequence of related remarks made by the prosecutor, defense counsel subsequently stated that the objection to "all of this" encompassed a challenge to the statement about the prospective juror.
With regard to the majority's second point regarding Brown, the mere fact that defense counsel in this case did not move for a mistrial is not a distinction that makes a difference under the circumstances of this case. "The law does not require litigants to make repeated pointless protests after the court has made its position clear" (People v Mezon, 80 NY2d 155, 161). During the postsummation colloquy, the Supreme Court made its position clear that "I don't find anything wrong with my ruling and I agree with the People's assertion . . . [t]hey were not trying to elicit emotion." The court even stated that "[f]or appellate purposes, the record stands" and the Appellate Court "may review it," and "[t]he record is protected." Thus, there was no reason for defense counsel, having already specifically raised the argument at issue on appeal, which the court expressly decided, to proceed to make a futile motion for a mistrial on the same ground.
Further, while a motion or objection must be made at a time when the trial court had the "opportunity to remedy" the error complained of in order to preserve the issue (People v Morris, 148 AD2d 552, 553), there was still an opportunity to remedy the error at the time of the postsummation colloquy, since that colloquy took place before the Supreme Court addressed several notes from the jury. It would not have been unduly burdensome for the court, while already recalling the jurors to issue additional instructions after deliberations had begun, to issue an instruction to refrain from considering the prospective juror mentioned on summation.
In addition, the majority's reliance on People v Balls (69 NY2d 641) is misplaced, since the Court of Appeals in Balls determined that an "unelaborated general objection to 'speculative facts'" raised after summation "did not alert the court to any of the comments now in issue and therefore was not sufficient to preserve the alleged prejudicial statements for appellate review" (id. at 642). As the Court of Appeals emphasized, the postsummation motion for a mistrial was premised solely on a vague statement that the prosecutor "referr[ed] to speculative facts not in evidence," "rais[ed] . . . his voice," and that "[t]he entire summation was so prejudicial and so speculative, not based on fact, that a mistrial should be granted" (id.). That vague objection was clearly insufficient to preserve the defendant's specific contentions, including that the prosecutor improperly bolstered the credibility of an expert by introducing evidence that defense counsel had retained the same expert in other cases, and misrepresented the testimony of another expert. In contrast, defense counsel raised specific objections to the summation remark at issue in this case, including that the prosecutor "made an egregious appeal to emotion and sympathy when he was talking about the needle and talking about a previous prospective juror that we had."
Accordingly, defense counsel's specific objections during the colloquy, coupled with her earlier objections made during summation, which resulted in the Supreme Court expressly deciding the issue raised on appeal, were sufficient to preserve the defendant's challenge to the [*13]portion of the summation at issue for appellate review.
B. Prosecutor's Appeal to Emotion
While a prosecutor on summation is afforded "the widest latitude by way of comment, denunciation or appeal in advocating his [or her] cause[,] summation is not an unbridled debate in which the restraints imposed at trial are cast aside so that counsel may employ all the rhetorical devices at his [or her] command," and "[t]here are certain well-defined limits" (People v Ashwal, 39 NY2d 105, 109 [citation and internal quotation marks omitted]; see People v Dawson, 178 AD3d 719, 720). "'Among other things, [the prosecutor] must stay within the four corners of the evidence and avoid irrelevant and inflammatory comments which have a tendency to prejudice the jury against the accused'" (People v Cantoni, 140 AD3d at 787, quoting People v Singh, 128 AD3d 860, 863 [internal quotation marks omitted]). "'A prosecutor would be well-advised not to test these limits, both so as to stay within his or her proper truth-seeking role and so as to avoid the waste of time and expense that occurs when a new trial must be conducted solely on the basis of summation misconduct'" (People v Dawson, 178 AD3d at 721, quoting People v Singh, 128 AD3d at 863). Further, prosecutors should be mindful that "their fundamental obligation is to seek justice, not merely to obtain a conviction" (People v Miller, 149 AD2d 439, 440; see People v Whalen, 59 NY2d 273, 280-281).
Here, the portion of the prosecutor's summation pertaining to the prospective juror was a highly prejudicial appeal to the emotions of the jurors (see People v DeJesus, 137 AD2d 761). Despite the absence of any testimony at trial that the needle caused Elmwafy to contract any disease, the prosecutor stated on summation that someone could "put stuff" in a needle that "can kill you" or infect a person with "a deadly disease" and "ruin[ ] their life," and asked the jurors to think back to jury selection "when the [prospective juror] talked about what happened to his partner." During jury selection, the prospective juror recounted how his former partner was "stabbed" with a needle by "a crackhead," "and a month later [his former partner] had HIV." In describing the prospective juror's remarks during jury selection, the prosecutor stated that the prospective juror "seemed to almost break down on the stand when he was talking about [his] ex-partner who was stabbed with a needle and got HIV." Thus, when the prosecutor mentioned the prospective juror on summation, he had to have anticipated that the jurors—who, according to the prosecutor, "all were here in jury selection"—would recall the emotionally charged story of the prospective juror's former partner having contracted HIV from a needle. Moreover, in making the contested remark, the prosecutor failed to comply with his obligation to "stay within the four corners of the evidence and avoid irrelevant and inflammatory comments which have a tendency to prejudice the jury against the accused" (People v Cantoni, 140 AD3d at 787 [internal quotation marks omitted]; see People v Lewis, 178 AD3d 952, 954).
My colleagues in the majority note that the prosecutor did not mention the effect of the prospective juror's partner being stabbed with a needle on the relationship between the prospective juror and his partner. However, the defendant's challenge to the summation remark on appeal is based on the prosecutor referring to an emotional description of an individual having contracted HIV from a needle, not due to the effect that event had on the prospective juror's relationship. Further, while the prosecutor did not specifically state on summation that the prospective juror's former partner contracted HIV, the prosecutor indicated that the seated jurors hearing the summation remark "all were here in jury selection," during which the prospective juror indicated that his former partner contracted HIV. Moreover, the prosecutor made the contested remark in conjunction with statements that someone stuck with a needle could contract "a deadly disease." Thus, it cannot reasonably be argued that the prosecutor was not directly referencing an individual having contracted HIV from a needle despite the absence of any evidence or testimony about that incident having been elicited at trial.
To the extent my colleagues in the majority argue that the remark was not improper because "[e]very juror knows from common life experience the risks that may attend from being stuck by a random needle," that point actually accentuates the impropriety of the remark. Indeed, it was not necessary for the prosecutor to ask the jurors to think back to a prospective juror's emotionally charged statement about his former partner having contracted HIV in order to make the commonsense point that a person may contract a deadly disease such as HIV from a needle. Thus, the sole possible purpose for the contested summation remark was to provoke the emotions of the jurors regarding a matter which needed no particular example to make the point (see generally People v Lewis, 178 AD3d at 953).
Further, to the extent my colleagues in the majority point to instances in which defense counsel's summation referred to jury selection, those instances are not properly before this Court for consideration, since they are not mentioned by the People on appeal. Notably, none of defense counsel's references to jury selection on summation pertained to the prospective juror whose former partner was stuck by a needle, and thus, they have no relevance to the propriety of the statement at issue.
Consequently, the portion of the prosecutor's summation pertaining to the prospective juror was improper.
C. Reversible Error
While an isolated improper summation remark generally does not rise to the level of depriving a defendant of the right to a fair trial (see People v Magliulo, 189 AD3d 1072, 1075), based upon the record in this case, it cannot be said that there was no significant probability that the jury would have acquitted the defendant of the robbery count had it not been for the error (see People v Crimmins, 36 NY2d 230; People v King, 115 AD3d 873, 875).
Insofar as relevant here, a person is guilty of criminal possession of a weapon in the fourth degree when he or she possesses a dangerous instrument "with intent to use the same unlawfully against another" (Penal Law § 265.01[2]). A dangerous instrument is defined as "any instrument, . . . which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury" (id. § 10.00[13]). Further, insofar as relevant, a person is guilty of robbery in the first degree when he or she "forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he [or she] . . . [u]ses or threatens the immediate use of a dangerous instrument" (id. § 160.15[3] [emphasis added]). A person "forcibly steals" property when, "in the course of committing a larceny, he [or she] uses or threatens the immediate use of physical force upon another person for the purpose of," inter alia, "[p]reventing or overcoming resistance to . . . the retention [of the property] immediately after the taking" (id. § 160.00[1]).
Here, inasmuch as the defendant was acquitted of criminal possession of a weapon in the fourth degree, the jury necessarily found that the People failed to establish, beyond a reasonable doubt, either that the needle constituted a dangerous instrument or that the defendant intended to use the needle unlawfully against another person (id. § 265.01[2]). Further, the jury convicted the defendant of robbery in the first degree, which required the jury to find that the needle was a dangerous instrument (id. § 160.15[3]), meaning that "under the circumstances in which [the needle wa]s used, attempted to be used or threatened to be used, [the needle wa]s readily capable of causing death or other serious physical injury" (id. § 10.00[13]). Thus, the jury necessarily found that the People failed to establish, beyond a reasonable doubt, that the defendant intended to use the needle unlawfully against Elmwafy, but that the People nevertheless established that the defendant, without intending to do so, either used or threatened to use the needle in a manner readily capable of causing death or other serious physical injury (see id. § 10.00[13]).
Significantly, Elmwafy did not testify at trial either that the defendant made any [*14]statements threatening the use of a needle or displayed the needle prior to Elmwafy being pricked by the needle. Further, the People did not present any evidence at trial that the mere act of having a needle in one's possession is capable of causing death or other serious physical injury, let alone that the needle in the defendant's possession contained HIV or blood contaminated with an infection. Indeed, the People's presentation of evidence that the defendant used the needle in a manner readily capable of causing death or other serious physical injury was extremely weak. Since the jury nevertheless made such a finding, it is highly likely that the jurors were influenced by the prosecutor's summation remarks that while a needle is appropriately used in the hands of "trained professionals," it becomes a "dangerous instrument" capable of infecting someone with a "deadly disease" in the hands of a person such as the defendant or the "crackhead" who infected the prospective juror's former partner with HIV. By making this connection between the prospective juror's former partner and the subject crime, the prosecutor led the jurors to find that the needle in the defendant's possession constituted a dangerous instrument.
To the extent my colleagues in the majority assert that, irrespective of the improper summation remark, the defendant's use of the needle in a manner readily capable of causing death or other serious physical injury may be "inferred" from the testimony of Elmwafy and Najjar, that determination amounts to speculation. As previously noted, Elmwafy acknowledged that he did not see the needle until after he was pricked, and thus, Elmwafy's testimony provides no basis to infer how the defendant used the needle at or before the time Elmwafy was pricked. Moreover, Najjar did not make any observations of the defendant until after Elmwafy had already been pricked, and even when Najjar arrived, he acknowledged that "their backs were turned to me so I couldn't see what was going on." Although Najjar testified that, after he "went around them" to "see what was going on," it "looked like . . . [the defendant] was trying to go and stab [Elmwafy]," the jury evidently did not credit that testimony, since the jury did not find that the defendant intended to use the needle unlawfully against another person. Thus, I conclude that the conviction of robbery in the first degree was attributable to the summation remark at issue.
Moreover, the impact of the prosecutor's summation remark on the verdict was further evidenced by multiple juror notes. Among other things, the jurors asked for clarification about "the difference between first degree robbery and petit larceny," indicating confusion as to whether the defendant used or threatened the immediate use of a dangerous instrument, or whether the defendant "forcibly st[ole]" property (Penal Law § 160.15[3]). The jurors also asked the Supreme Court to clarify "where the needle came from as [Elmwafy] was struggling with the defendant and how it happened," and to reread the grand jury testimony regarding "the defendant threatening [Elmwafy] with a needle," suggesting the jurors were concerned by the absence of testimony that the defendant threatened to use the needle or displayed the needle to Elmwafy prior to Elmwafy being pricked. In light of the jury notes and the verdict acquitting the defendant of criminal possession of a weapon in the fourth degree, it cannot be said that there was no significant probability that the jury would have acquitted the defendant of the robbery count had it not been for the prosecutor's highly prejudicial remark pertaining to the prospective juror.
To the extent my colleagues in the majority suggest that the summation remark was not reversible error because of a generalized presummation instruction to the jurors that "nothing the lawyers say in their summations is evidence," I disagree. At the very least, the Supreme Court should have issued an instruction specific to the remark at issue after that statement was made, such as to instruct the jurors to refrain from considering any circumstances pertaining to the prospective juror (cf. People v Mack, 128 AD3d 1456, 1457).
Accordingly, the judgment should be reversed, and a new trial ordered (see People v Ramirez, 180 AD3d 811, 812).
In any event, the incarceration portion of the sentence imposed on the conviction of [*15]robbery in the first degree of a determinate term of imprisonment of seven years was excessive as discussed hereinafter.
III. Excessive Sentence
A. Additional Relevant Facts
While the defendant did not appear for an interview with the Department of Probation, the circumstances regarding his background were set forth in detail in a presentence memorandum from the Legal Aid Society. The circumstances set forth in the presentence memorandum were not contested by the People in any respect either prior to or at sentencing.
The defendant is a lifelong resident of Queens, born in July 1961, whose parents were divorced when he was 16 years old. As indicated in the presentence memorandum, the defendant "took [his parents'] separation very hard," and around that time, "[p]eers within his community introduced him to drugs, which he used as a means of coping." Since that time, the defendant has struggled with drug addiction. Also in his youth, the defendant had his first encounter with the criminal justice system when he was arrested in December 1978, at the age of 17, and he was convicted in July 1979 of criminal possession of stolen property in the fifth degree.
Shortly thereafter, in May 1980, at the age of 18, the defendant was arrested and convicted later that year of robbery in the second degree, his first felony offense. Since that time, the defendant was convicted of two more felonies prior to the subject offense: two separate convictions of criminal sale of a controlled substance in the third degree, respectively, in 1984 and 1993. From the time of his conviction in 1993 to the occurrence of the subject offense in August 2018, more than 25 years later, the defendant has only had convictions for misdemeanor offenses such as criminal possession of a controlled substance in the seventh degree and petit larceny.
Despite his struggles with drug addiction and "sporadic periods of homelessness," the defendant was employed as a commercial truck driver for approximately 10 years, which employment ceased "due to legal troubles." The defendant has also been employed as a line cook for various restaurants, including working for a restaurant for approximately two years as his most recent employment until his arrest for the subject offense.
At the time of the subject offense in August 2018, the defendant was 57 years old, with two adult children, and he suffered from medical problems including cirrhosis. Since the commission of the subject offense, the defendant has also experienced pain and mobility issues attributable to varicose veins, creating difficulties with walking or standing for extended periods of time.
During his incarceration for the subject offense, and prior to sentencing, the defendant chose to engage in substance abuse treatment, psychotherapy for mental health issues, and culinary arts instruction, and performed multiple jobs in prison, including maintenance, cleaning, and serving as a line cook.
At sentencing, the defendant stated that, although "it wasn't my intention to hurt nobody, simply to take four packs of steaks to fuel my drug addiction," "I want to say that I'm sorry to somebody that I hurt that day." The defendant indicated that he had a history of drug abuse, stating, "I come from my brothers and sisters that use drugs in the neighborhood I was raised in, created that environment, which I sort of regret now at my age." The defendant added that "I don't blame the system, I blame myself for making the wrong choices that I did," and "I'm almost 60 years old and I don't intend to do this again."
In rendering the sentence, the Supreme Court stated that "this case is about a non-violent crime, petit larceny, which . . . escalated into a violent felony, Robbery in the First Degree." The court added that the defendant had "a lengthy criminal record," and "all of these convictions essentially concern larceny, and the use and possession of drugs." The court referred to the defendant as "a career criminal whose criminal record goes back 40 years." The court also described [*16]the defendant as "a violent person and a danger to the community and public safety."
The Supreme Court imposed a sentence of a determinate term of imprisonment of seven years, to be followed by a period of postrelease supervision of five years on the conviction of robbery in the first degree, and a concurrent definite term of imprisonment of one year on the conviction of criminal possession of stolen property in the fifth degree.
B. Reduction of the Sentence is Warranted
I disagree with my colleagues in the majority that the sentence imposed on the conviction of robbery in the first degree was appropriate, and I would reduce the incarceration portion of the sentence imposed on that conviction from a determinate term of imprisonment of seven years to a determinate term of imprisonment of five years.
Although the determination of an appropriate sentence, in the first instance, is entrusted to sentencing courts, which are empowered to exercise their discretion (see People v Farrar, 52 NY2d 302, 305-306), "'[a]n intermediate appellate court has broad, plenary power to modify a sentence that is unduly harsh or severe under the circumstances, even though the sentence may be within the permissible statutory range'" (People v Kerringer, 195 AD3d 861, 862, quoting People v Delgado, 80 NY2d 780, 783; see CPL 470.15[6][b]). "Our sentencing review power 'may be exercised, if the interest of justice warrants, without deference to the sentencing court'" (People v Kordish, 140 AD3d 981, 982, quoting People v Delgado, 80 NY2d at 783). In considering whether a sentence is unduly harsh or severe under the circumstances, "we exercise our discretion giving consideration to, 'among other things, the crime charged, the particular circumstances of the individual before the court and the purpose of a penal sanction, i.e., societal protection, rehabilitation, and deterrence'" (People v Kordish, 140 AD3d at 982-983, quoting People v Farrar, 52 NY2d at 305; see Penal Law § 1.05; People v Kerringer, 195 AD3d at 862). "There is no place in the scheme for punishment for its own sake, the product simply of vengeance or retribution" (People v Oliver, 1 NY2d 152, 160; see Penal Law § 1.05; People v Farrar, 52 NY2d at 305).
Here, as the Supreme Court observed, "this case is about a non-violent crime, petit larceny," in which the defendant walked out of a supermarket without paying for a few steaks worth an approximate total of only $50. It is undisputed that the defendant did not display a weapon or make any threats to anyone in the store, but rather simply placed the steaks in his bag, neglected to pay for the steaks when he purchased a loaf of bread, and walked out of the store without anyone asking to inspect his bag. At that point, the defendant's conduct amounted to nothing more than petit larceny or criminal possession of stolen property in the fifth degree, each a class A misdemeanor punishable by no more than 364 days imprisonment (Penal Law §§ 70.15[1]; 155.25, 165.40).
Although the defendant's conduct, as the Supreme Court stated, "escalated into a violent felony," that escalation was precipitated by the manner in which the store employees handled the situation. After permitting the defendant to leave the store without asking to check his bag or questioning him, Najjar instructed Elmwafy to "follow" and "[o]bserve" the defendant from "a distance," without "mak[ing] any trouble." Elmwafy followed the defendant at a walking pace through the parking lot to the sidewalk, and then continued walking for nearly a block. After the defendant had already walked a significant distance from the store, Elmwafy approached the defendant and purportedly told him to "give me [the] merchandise." There is no indication in the record that Elmwafy identified himself to the defendant as an employee of the store, that the defendant had any prior familiarity with Elmwafy, or even that the defendant understood Elmwafy, who testified at trial in Arabic through an English interpreter. At that point, Elmwafy got into a struggle with the defendant, during which Elmwafy got pricked by the needle. Elmwafy did not testify at trial that the defendant threatened him with the needle or that he saw the defendant trying to use the needle as a weapon. Thus, there is no indication from Elmwafy's testimony that the defendant intentionally jabbed him with the needle during the struggle, or even that the defendant [*17]understood the individual reaching into his bag outside the store was an employee of the store.
Moreover, any injury sustained by Elmwafy from the needle was extremely minimal. Elmwafy acknowledged it was "not that painful" when he got pricked by the needle, that although he went to the hospital for routine examination, he was discharged within only two to three hours, that he "did not have pain" at the hospital, and that the only consequences to him from the incident were having to take precautionary antiviral medication for one week, which gave him mild symptoms such as sleepiness. Further, Elmwafy's hospital records, which indicate that he was discharged with a diagnosis of "accidental" "[n]eedle stick," reflect that Elmwafy did not contract any diseases.
Thus, to the extent the Supreme Court found that the defendant engaged in "violent behavior" demonstrating "his willingness to injure someone rather than give the item back," the court's findings amounted to a substantial exaggeration. At most, the record reflects that the 19-year-old security guard got into a "struggle" with the 57-year-old defendant, during which Elmwafy got pricked by a needle, which did not cause him any significant pain or injury.
Indeed, if anyone was the victim of "violent behavior" during the incident, it was the defendant, who was subjected to four individuals kicking him, kneeling on his head or neck and back, and standing on his hands or wrists over the span of approximately eight minutes until the police arrived, during which the defendant did not visibly fight back and only periodically struggled to simply lift his head or sit up. Elmwafy's testimony suggests this conduct was fueled by a desire for retaliation against the defendant, as Elmwafy stated that he and Najjar "knock[ed the defendant] down" "because of him hitting me with a needle, and . . . because of the things that he took from the store." While the defendant's treatment at the hands of the store employees does not excuse his earlier conduct, it is troubling that the Supreme Court would label the defendant "a violent person" based on an incident in which the 57-year-old defendant was himself subjected to such violent behavior.
Further, the Supreme Court's characterization of the defendant as a "violent person" is not supported by the defendant's criminal record, which includes only a single prior crime classified as a violent felony, robbery in the second degree, committed when the defendant was only 18 years old in 1980, nearly 40 years prior to the subject offense. While the defendant has had numerous convictions since that time, only two of those convictions were felonies and both were nonviolent crimes involving drugs. Notably, the defendant's most recent felony conviction for criminal sale of a controlled substance in the third degree dates back to 1993, approximately 25 years prior to the subject offense. Otherwise, the defendant has had only misdemeanor convictions for nonviolent conduct such as criminal possession of a controlled substance in the seventh degree and petit larceny.
Moreover, the presentence report indicates that prior to the subject offense, the defendant had not even received a sentence of imprisonment in excess of 15 days since 2007, when he received a sentence of one year of imprisonment on a conviction of unauthorized use of a vehicle, which demonstrates a clear reduction in the severity of the defendant's crimes over time. Thus, the mere quantity of the defendant's past offenses over a lengthy period of time does not provide a sufficient basis to justify upholding the sentence imposed (see People v Mitchell, 168 AD3d 531, 532).
While my colleagues in the majority note that the defendant also had five parole revocations and one revocation of probation, there is no indication in the record that the defendant had any recent parole or probation revocations. To the contrary, the presentence report indicates that the parole violations concerned sentences of parole imposed on the robbery conviction dating back to 1980, for which a certificate of relief was granted to the defendant in 1983, and on a conviction of attempted criminal sale of a controlled substance in the third degree dating back to 1992. The [*18]presentence report also indicates that the probation revocation was for a technical violation following the imposition of probation on a conviction of possession of stolen property dating back to 1979. Thus, the record demonstrates a marked improvement in the defendant's conduct over time prior to the subject offense given the absence of any recent parole or probation revocations.
In addition, the Supreme Court failed to afford due consideration to the defendant's longtime drug addiction, which was the basis for most of his criminal record and which appears to have motivated his commission of the subject offense (see People v Kordish, 140 AD3d at 983; People v Howard, 120 AD3d 1259, 1261). To the extent the crime escalated to conduct beyond the theft of a few steaks worth approximatey $50 to pay for the defendant's drug addiction, there is no indication in the record that the defendant planned to use the needle against another individual (see People v Cordato, 85 AD3d 1304, 1311). Moreover, since his incarceration for the subject offense, the defendant has made numerous efforts to better himself, including engaging in substance abuse treatment, psychotherapy for mental health issues, and culinary arts instruction aimed at pursuing employment as a cook after release, as well as performing multiple jobs in prison, including maintenance, cleaning, and serving as a line cook.
The record also reflects that the defendant, who was 58 years old at the time of sentencing, suffers from medical problems, including cirrhosis and mobility issues attributable to varicose veins, creating difficulties with walking or standing for extended periods of time. In describing the defendant as "a danger to the community and public safety," the Supreme Court failed to afford due consideration to the defendant's medical problems including mobility issues, that the defendant would be 63 years old at the time of release if sentenced to the minimum term of five years' imprisonment, or that the defendant would still be subject to a period of postrelease supervision of five years once released from prison.
Finally, the defendant expressed clear remorse at sentencing, stating, "I want to say that I'm sorry to somebody that I hurt that day," and "I don't blame the system, I blame myself for making the wrong choices that I did." The record also includes a letter from the defendant's mother expressing her hope that the defendant would be treated with compassion.
Considering all of the relevant circumstances, including that the subject offense was an aberration for the defendant, who had not committed a single crime involving violent conduct or classified as a violent felony since 1980, that the subject offense only escalated beyond the level of a class A misdemeanor when Elmwafy instigated a confrontation with the defendant outside the store, that the defendant was subjected to violent behavior by the store employees, that the defendant's crime was fueled by drug addiction, which he has since made efforts to overcome, and in view of the defendant's advanced age and medical conditions, I conclude that the sentence imposed of a determinate term of imprisonment of seven years on the conviction of robbery in the first degree was excessive. Accordingly, I would reduce that sentence to a determinate term of imprisonment of five years, to be followed by a period of postrelease supervision of five years.
Regardless, for reasons stated heretofore, I vote to reverse the judgment and order a new trial.
ENTER:
Maria T. Fasulo
Clerk of the Court